## Sharpe, Appellant, *v.* Federal Window and Office Cleaning Co. et al.

Argued October 22, 1940.

Before

KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Maceo W. Hubbard,* with him *Raymond Pace Alexander,* for appellant.

*S. H. Torchia,* with him *Ralph H. Behney* and *Claude T. Reno,* Attorney General, for appellees.

OPINION BY KELLER, P. J., April 16, 1941:

Claude E. Sharpe, while in the employ of Federal Window and Office Cleaning Company, was killed on March 11, 1937 by an accidental fall from a window he was cleaning in the course of his employment.

A claim for compensation was filed on March 19, 1937 by Amanda Sharpe, claiming to be his widow. At the time of his death she was pregnant, but on the oral argument it was stated that the child was born dead.

She testified that she first met the decedent at a New Year's dance in 1933 and after going together for a while, on a Saturday night in April, 1933, they went through the form of a common law marriage in a room at his home, 1934 Christian St., Philadelphia, and that later that night he introduced her as his wife to some

friends, who had been invited to a party there; that he took her to a room at 1303 Kenilworth Street, where they spent the night and lived together there all summer, and that they lived together thereafter as husband and wife to the day of his death. There were some discrepancies in the testimony as to his living between 1933 and 1937 at various places not shared by her which threw some doubt on her statements, but the finding of the referee and the board that a common law marriage between them took place as stated by her is supported by evidence and is binding on us. The difficulty is that it was proved conclusively not only by the testimony of the deceased employee's sister and her husband and others, but also by the Philadelphia County marriage license records that a marriage license was issued on May 13, 1931 to the said Claude E. Sharpe and Rachel Thomas, a young woman then twenty-two years old, and that on May 23, 1931 they were married by Rev. Edward L. Kinzer; and unless his wife, Rachel, had died or was divorced from him prior to his common law marriage to the claimant in April, 1933, the latter was not a valid marriage and the claimant was not his wife. See *Wilbert v. Com. of Penna. Second Injury Reserve Account et al.,* 143 Pa. Superior Ct. 37, 17 A. 2d 732. As we pointed out there, if illegal when entered into, it would require affirmative action to validate it, after the death or divorce of the other wife, either in the way of a ceremonial marriage or a new agreement of common law marriage. See *Hantz v. Sealy,* 6 Bin. 405; *Murdock's Est.,* 92 Pa. Superior Ct. 275; *Estate of Mary F. Hughes,* 98 Pa. Superior Ct. 328; *Fitzpatrick v. Miller,* 129 Pa. Superior Ct. 324, 196 A. 83. There was no evidence in this case of any subsequent marriage, either ceremonial or common law, after the alleged marriage of April 1933, so the claimant's case must stand or fall by the validity of that marriage.

The referee who heard the case found, inter alia, the following facts:

"5. That the decedent was married to one Rachel Thomas in 1931. He lived with her but a short while.

"6. That thereafter, and without obtaining a divorce, the decedent went through a common law marriage ceremony in April 1933 with a woman who subsequently became known as Amanda Sharpe......

"8. That the wife of the decedent by his first marriage, Rachel Sharpe, has not been seen or heard of since 1931". And he made, inter alia, the following conclusion of law:

"2. The referee further concludes as a matter of law that although the decedent died leaving a widow who cannot be found and who has made no claim for compensation, and although the decedent left to survive him also a widow to whom he was properly married, but which marriage was illegal, the said Amanda Sharpe is not entitled to any compensation in accordance with the provisions of the Workmen's Compensation Act of 1915, as amended." Pursuant thereto compensation was refused the claimant.

On appeal to the board, that body recognized that the question raised was substantially one of law. Nevertheless it set aside the sixth finding of fact of the referee and his second conclusion of law and substituted the following:

"Sixth finding of fact. The Board finds as a fact that in April, 1933 decedent went through a common law marriage ceremony with the present claimant, a woman who subsequently became known as Amanda Sharpe."

"Second conclusion of law. The Board concludes as a matter of law that upon the basis of the facts on the record a presumption arises that the first marriage to which decedent was a party, was dissolved either by divorce or by the death of decedent's wife, prior to his contracting the common law marriage with the present claimant." And the board accordingly awarded the claimant compensation as the deceased employee's widow.

The State Workmen's Insurance Fund appealed to the court of common pleas, assigning, inter alia, the following exceptions:

"1. That the findings of the learned Workmen's Compensation Board are not supported by sufficient and competent evidence ......

"4. That the learned Workmen's Compensation Board erred as a matter of law in concluding that a presumption arises that the first marriage to which decedent was a party was dissolved, either by divorce or by death of decedent's wife prior to his contracting a common law marriage with the present claimant.

"5. That the learned Workmen's Compensation Board erred as a matter of law in concluding that the claimant is entitled to receive compensation because of the death of her alleged husband, even though decedent's prior marriage was undissolved, either by divorce or by death.

"6. That the learned Workmen's Compensation Board erred as a matter of law in awarding compensation to the present claimant."

The court, after hearing the parties, in an opinion by Judge FENERTY, sustained the exceptions and appeal and set aside the board's conclusion of law as above and award to the claimant, and entered judgment as to that award in favor of the defendants, holding that "As Claude E. Sharpe was incapable of contracting a valid marriage, Amanda Sharpe was never the lawful wife of the decedent."

The claimant appealed to this court. The judgment will be affirmed.

In the first place, a careful review of the evidence fails to sustain the last sentence in the fifth finding of fact of the referee and his eighth finding of fact, both of which findings were adopted by the board and probably were used to support its conclusion of law aforesaid. The portions of the findings not supported by any evidence in the record are italicized as follows:

Fifth finding of fact. "That the decedent was married to one Rachel Thomas in 1931. *He lived with her but a short while.*"

Eighth finding of fact. *"That the wife of the decedent by his first marriage, Rachel Sharpe, has not been seen or heard of since 1931."*

The testimony establishes without contradiction that Claude E. Sharpe and Rachel Thomas were married on May 23, 1931; that they went to live with his sister, Mrs. Mary E. Baker and her husband, Joseph Baker, and lived there during all the summer months of 1931; that they then left together and lived with Mr. and Mrs. Emmet Vinson, after which they got an apartment on Ludlow Street, and after that they moved back to the Baker's in 1932—"in the winter of 1932", Mrs. Baker said. They lived there several weeks or a month and then agreed to separate, and Rachel left and went to Washington, D. C. Mrs. Baker did not explain whether by the "winter of 1932" she meant January, February or March 1932, or December 1932. If the former, they were living together up to within *fifteen months* of the alleged common law marriage; if the latter, up to within *four months* of the alleged common law marriage.

Mrs. Baker also testified, without contradiction, that she saw Rachel Sharpe, the deceased employee's wife, in Philadelphia the summer following the separation. If they separated in January-March 1932, this would be the summer of 1932; if the separation was in December 1932, it would be the summer of 1933, and *after* the alleged common law marriage. Rachel had come from Washington and was en route to New York. She stopped and visited at Mrs. Baker's home. Mrs. Baker said it was the summer following the year she (Rachel) left. She was corroborated in this testimony by her husband. Emmet Vinson testified that Claude Sharpe and his wife Rachel lived with him and his wife, from September 1931 for about four months, and, under cross-examina-

tion by claimant's counsel he stated that he had seen them while they lived with the Baker's "in the early part of the winter of 1932"; that he had not seen Rachel since he "saw her at his [Claude's] sister's home in 1932".

It is interesting to note that the Baker family had no knowledge of Claude's alleged marriage to the claimant, and did not see or know her until the night of Claude's death, at the undertaker's.

There was therefore not only no testimony in the record to support the findings which we have taken exception to as above, but the overwhelming and uncontradicted testimony was to the contrary, as before noted. In the face of such positive and uncontradicted testimony, the above findings of the referee and the board which are without any evidence to support them could not stand. There was therefore established a valid, ceremonial marriage between Claude Sharpe and Rachel Thomas on May 23, 1931, pursuant to which they lived together as man and wife until the winter of 1932, when they separated and Rachel left and went to Washington, D. C.; and the summer following the separation, which could not have been earlier than the summer of 1932, and might have been the summer of 1933, Rachel stopped off and visited the sister and brother-in-law of her husband in Philadelphia en route to New York. The legal question before us is whether in these circumstances, the common law marriage which Claude Sharpe went through with the claimant in April 1933 was valid and legal. We agree with the court below that it was not.

In the first place there was in this case no presumption of Rachel's death at the time of the common law marriage in April 1933, as was present in *McCausland's Est.*, 213 Pa. 189, 62 A. 780, and *Baker v. Fidelity T. & T. Co.*, 55 Pa. Superior Ct. 15. Rachel Sharpe was last seen in Philadelphia only the summer before and

possibly the summer following. The presumptive period of seven years had not ,run by two or three years even when Claude Sharpe died. So that is out of the case.

The board placed its decision squarely on the presumption of innocence of wrong doing, and relied in support thereof chiefly on *Wile's Est.*, 6 Pa. Superior Ct. 435, and *Holben's Est.*, 93 Pa. Superior Ct. 472; and the appellant cited in further support thereof the case of *Thewlis's Est.*, 217 Pa. 307, 66 A. 519. But in all those cases the circumstances were vastly different from this case and were much more consonant with the innocence of the party entering into the second marriage than in this case.

In *Wile's Est.*, supra, this court affirmed the judgment of the court below holding that the marriage in 1884 of Elizabeth Wile Andrews, the daughter of George Wile, whose estate was being distributed, to John Shetzline was valid and legal, and that their son, John Shetzline, Jr., the grandson of the decedent, was a legitimate heir of his estate. The justly respected Judge PENROSE, of the court below, stated the facts as follows: "It appears that in 1866 the boy's mother was married to a man who deserted her in 1872, after having treated her with great brutality and after repeatedly declaring that she was not his wife. He disappeared from the city, and she was told that he was dead; but it was not until 1884, after an interval nearly twice as long as that required to create a presumption of death, that she contracted a second marriage—never, in the meanwhile, having heard of, or had any communication with him. But he was not dead; and a year or two after the birth of the child whose legitimacy is now attacked, he appeared again in Philadelphia, thus putting an end, of course, to the presumption of death arising from his long continued absence. *If the case rested here, there could be no escape from the conclusion that the second marriage of the wife, notwithstanding the good faith*

*with which it was contracted, was void ab initio.*[1] But it was shown that two or three years after his desertion, the supposed first husband married another woman, with whom, as his wife, he has ever since lived and cohabited; and as he would otherwise be guilty of bigamy, it is to be presumed either that he spoke truthfully when he asserted that the marriage of 1866 was, for some undisclosed reason, void, or that after his desertion and before his remarriage, he obtained a divorce. A divorce so procured, even if service were not effected upon the opposite party, would be voidable only, not void; and after the remarriage of both parties both would be bound by it (see *Richardson's Estate,* 132 Pa. 292; *Pennoyer v. Neff,* 95 U. S. 714; Bishop on Marriage and Divorce, secs. 163, 199)". This court affirmed, in an opinion by President Judge RICE, laying special stress on the length of time that had elapsed before her second marriage, the declaration of her former husband, Andrews, that she was not his wife, Andrews' second marriage, and the presumption in favor of the legitimacy of children, and saying in part as follows: "The declaration of Benjamin Andrews that the mother of the appellee was not his wife; his marriage to another woman with whom he lived openly as his wife, and who was so recognized by his daughter; the terms of intimacy and friendship which existed between the mother of the appellee and her second husband's family during all the period of their marriage; their recognition of her as his lawful wife, and of the appellee as his legitimate child, emphasized by a solemn promise made by one of the appellants to the father upon his death bed; the lapse of time, during all which no question appears to have been raised by any one as to the validity of either of the second marriages, are facts which cannot be overlooked in determining such an issue as is pre-

---

[1] Italics supplied.

sented here. They do not, of themselves, prove the dissolution of the first marriage, it is true, but they do show a probability of it, which, taken in connection with the presumption of innocence and legitimacy, neutralized the presumption that Benjamin Andrews was the lawful husband of Elizabeth at the time of her marriage with John Shetzline, and left the fact essential to the appellants' claim not proven."

In *Holben's Est.*, supra, the widow claimant had been married in 1871 in Tennessee to one Eastman. They lived together until sometime in 1882, when he left the state, and she had no communication with him nor knowledge of his whereabouts prior to his death in Michigan in November, 1903. She had heard it reported, prior to 1898, that he was dead. She married Holben in 1898 before a justice of the peace in Salamanca, N. Y. and no question was ever raised as to the validity of the marriage until after Holben's death in 1926. He referred to her as his wife in numerous deeds and in his will. Eastman married another woman in Michigan in 1900. All of these facts, which are recited at great length in the opinion, including the long period of time between Eastman's departure and her second marriage, and Eastman's second marriage during Holben's lifetime, led this court to hold that the presumption of innocence, when applied to those facts, was sufficient to sustain the validity of her marriage to Holben.

In *Thewlis's Est.*, supra, the decedent, Thewlis, a married man, deserted his wife in England in 1858 and came to America. He married again by a religious ceremony in 1868. His wife was married again in England to James Hirst in 1869 and had six children by him. He having died, she became the wife of Charles Dyson in 1880. She died in 1891 and Thewlis in 1904. He lived with his second wife from 1868 to his death in 1904 and during all that time—including the thirteen

years following the first wife's death in 1891 and his death in 1904—she was recognized by him and by the community as his lawful wife, and in 1896 they executed a deed in which they recited themselves as husband and wife. The question was whether the woman whom Thewlis married in 1868 and who lived with him in the marriage relation until his death was his lawful wife. The Orphans' Court of Philadelphia County (PENROSE, J.) in an opinion adopted by the Supreme Court, held that she was, basing its action partly on the presumption of innocence but still more on the presumption in favor of legitimacy,[2] as the legitimacy of the six children of James Hirst and his wife depended on the legality of the first wife's second marriage. But here again, many years elapsed between the separation of the husband and his first wife and his marriage to the second wife, and the first wife was married twice in the period between Thewlis' emigration to America and his death, and had had six children. It was the combination of all these circumstances that justified the application of the presumptions relied on.

The facts in this case warrant no such action. (1) No long period of years intervened between Sharpe's separation from his wife Rachel and his alleged common law marriage to the claimant—only four to fifteen *months* at the most. (2) No second marriage by his wife Rachel was shown, as was present in the cases above referred to. (3) The legitimacy of a child or children is not involved in this case. Furthermore all those cases were concerned with the distribution of a decedent's estate, and in all of them the decedent had recognized the validity of the relation which certain heirs were seeking to attack. Here we are concerned with the contractual obligation to pay workmen's compensation by a stranger, who assumed a duty to no one

---

[2] See our recent case, *May's Est.*, 141 Pa. Superior Ct. 479, 484, 15 A. 2d 569 (RHODES, J.). Appeal refused November 25, 1940.

except the employee's *legal* wife, who was dependent upon him for support.

The period of time which elapsed between the separation of Sharpe and his wife Rachel was not sufficient to enable either of them to get a divorce on the ground of desertion, and if they agreed to separate, as was testified, neither could get a divorce on that ground until he or she first in good faith sought a reconciliation and was refused by the other spouse.

In civil cases the presumption of innocence is rebutted by a preponderance of the evidence; the rule in criminal cases, requiring proof beyond a reasonable doubt, does not apply: *Floyd v. Paulton Coal Mining Co.,* 94 Pa. Superior Ct. 1, 5, 6.

If the presumption of innocence should be permitted to overcome the presumption that a valid marriage once established continues until the contrary is proved, in circumstances such as were shown to be present in this case, it could be applied with equal effect to validate every case of meretricious relations, of which scores or more have been rejected as invalid in the Supreme Court and this court.

We are in accord with the following statements from the opinion of the lower court: *"Wile's Appeal* must be accepted as good law, on its facts, but its doctrine will not sustain the Board in the case under consideration, where the facts and the proper legal presumptions fail to bring it within the rule in *Wile's Appeal.* And *Senser v. Bower,* supra, [1 P. & W. 450, 452] goes to the extent only of holding that where the proof is equal the presumption is in favor of innocence. In the instant case, neither the presumptions nor the proofs are equal. Claude E. Sharpe and Rachel Sharpe were married in 1931. Therefore, in the absence of any other proof, except that the parties separated in 1932, and that he began to live with Amanda Sharpe in 1933, the presumption that the beginning of the relationship between Claude E. Sharpe and Amanda Sharpe was mere-

tricious is too strong to be overcome by the presumption of innocence. Something more than legal presumption was required to establish the fact that Claude E. Sharpe had been freed from his marital contract with Rachel Sharpe so that he could contract a new marriage with Amanda Sharpe. A man cannot at the same time legally have two wives; and one who has married once cannot lawfully marry again unless the first marriage has been dissolved by absolute divorce or by death. And if a second marriage is entered into, it is void ab initio: *Clark's Estate*, 173 Pa. 451. [See also *Thomas v. Thomas*, 124 Pa. 646]. In any situation where the presumption of divorce is applicable it will be noted that the relationship of the parties to the second marriage was legal from the very inception and continued to be so. The marriage of a man or woman, where one of them has by a prior marriage a husband or wife who is then living and undivorced, is not merely voidable, but void, whether it be meretricious or founded in mistake ...... As Claude E. Sharpe was incapable of contracting a valid second marriage, Amanda Sharpe was never the lawful wife of the decedent."

The judgment of the lower court is affirmed.