Opinion by
 

 Cunningham, J.,
 

 Arthur L. Fritsche, the employee for whose death compensation is sought in this case, was the night manager of Stenton Garage located on the northeast corner of Eastburn Street and Stenton Avenue in the City of Philadelphia. It fronts 110 feet on the avenue, with an office about midway and large doors north and south thereof. Stenton Avenue is 36 feet wide from curb to curb. Across the avenue from the garage a mail box is located along the western curb about five feet north of an intersecting east and west street having different names on the respective sides of Stenton Avenue — to
 
 *155
 
 the east it is called Eastburn and to the west Rittenhonse. One hundred and thirty-five feet north of Rittenhouse, Narragansett Street, twenty feet in width, intersects Stenton Avenue from the west but does not cross the latter. On the northwest corner of Narragansett Street and Stenton Avenue there is a restaurant.
 

 About midnight on January 25, 1938, Fritsehe, while in the western portion of the cartway of Stenton Avenue and near the mail box, was accidentally struck and so injured by an automobile coming south on the avenue that his death resulted on the following day.
 

 On February 14, 1938, the claimant filed her petition for compensation in which she averred she was the dependent widow of the deceased employee and as such entitled to compensation under the provisions of Section 301 of the Workmen’s Compensation Act of June 2, 1915, P. L. 736, as amended and reenacted by the Act of June 4, 1937, P. L. 1552, 77 PS §§411, 431.
 

 After a number of hearings and rehearings the board affirmed a referee’s award to claimant in the amounts provided by the Act of 1937. The court below dismissed the appeal and exceptions of the employer and his insurance eaiTier, affirmed the action of the board, and entered judgment upon the award. The present appeal is by the employer and carrier from that judgment.
 

 Liability was denied by appellants upon two grounds: (1) That decedent’s conceded accidental and fatal injuries were not sustained in the course of his employment in that when they were inflicted he was neither on the employer’s “premises” nor “engaged in the furtherance of the business or affairs of [his] employer”; and (2) that claimant was not the lawful wife of the employee at the time of his death. These defenses will be considered.in the order stated:
 

 1. From what has already been said it is apparent that the employee was not upon the premises of his em: ployer, within the meaning of the statute, when struck
 
 *156
 
 by the automobile but was standing or walking in the western half of the cartway of Stenton Avenue opposite the garage. See
 
 Wiles v. American Oil Co. et al.,
 
 105 Pa. Superior Ct. 282, 161 A. 467.
 

 The controlling inquiry, therefore, upon this branch of the case is whether, although off the premises, the decedent was engaged in the furtherance of the business or affairs of his employer when injured. Upon that question we have the following material findings (168a) by a referee, affirmed by the board (319a):
 

 “5. That at about 11:30 p.m., the decedent left his place of employment to mail a letter for his employer and to obtain some refreshment.
 

 “6. That within one-half hour of the time that the decedent left his place of employment as aforesaid, he was run over by an automobile as a result of which he died the following morning.
 

 “7.
 
 That this accident occurred at a point approximately opposite his place of employment.”
 

 An additional finding by the board reads (320a):
 

 “Tenth: While on duty
 
 in the course of his employment
 
 at 11:30 p.m.. January 25, 1938, the decedent, Arthur Fritsche, was struck by an automobile and died early the following morning.” (Italics supplied.)
 

 The sole question of law now involved upon this branch of the case is whether the record contains sufficient competent evidence justifying the conclusion of the board that decedent had not departed from or abandoned the course of his employment at the time of the accident, but was then and there engaged in performing an uncompleted errand connected with the business or affairs of his employer.
 

 On the night of the accident the decedent’s hours of employment were from 6:00 P.M. until 8:00 A.M. the following morning; no specific time was fixed for a lunch period. George Snyder, another employee, testified he turned the garage over to decedent the evening
 
 *157
 
 before the accident; that the employer had given the witness a letter to be mailed; and that, as it was past the working hours of the witness, the decedent offered to “take care of it.” With further reference to this letter the testimony of the witness continued: “Q. Where did you get this letter from? A. I believe it was from the boss. Q. What makes you believe that? A. That was the only letter I would mail from there, I wouldn’t mail anybody else’s. Q. Did you turn this letter over to Mr. Fritsche to mail? A. Yes, -that is right, he offered to mail it for me. Q. Did you give it to him to mail? A. No, I left it on the cash register in the garage.”
 

 Daniel K. Palladiani testified he was “hanging around” the garage, as was his custom, on the evening of the occurrence; that he had noticed a letter on the cash register “not long before the accident occurred”; that he was with Fritsche in the front office until about midnight when he saw Fritsche leave the office and start toward the mail box; that he (the'witness) then went into the back office to watch a game of cards in which two men — Nagle and Larkins — were engaged; that when he returned to the front office within a few minutes he saw the crowd attracted by the accident, and that shortly thereafter when placing a searchlight (which had been found with Fritsche’s glasses at the scene of the accident) upon the register he didn’t notice the letter, although it had been in a position where it could readily be seen.
 

 Mrs. Anna Brooks testified she lived at the northwest corner of Rittenhouse Street and Stenton Avenue, her house facing on the former; that there was a mail box about five feet north of the north curb of Rittenhouse Street and that the house was about twelve feet farther away. About three minutes of twelve she heard a bus, then the sound of the mail box, and almost immediately afterwards, the “impact.” Her daughter also testified she “heard the impact and then looked” and that Frit
 
 *158
 
 sche was facing in the direction of the garage when she saw him fall from the car at a point “about ten or twelve feet” from the letter box.
 

 Miss Minerva Foulke, the driver of the car which struck Fritsche, testified she did not see him until he was in front of her headlights, and could not tell in which direction he was crossing, but saw nothing in his hands..
 

 There was also testimony that the decedent visited the restaurant at the northwest corner of Narragansett Street and Stenton Avenue shortly before the accident.
 

 Joseph T. Larkins, above mentioned, testified that on the evening in question he came to the garage about 9:30 p.m. At about 11:30 Fritsche told the witness “he was going out to get something to eat” and “asked [him] to take care of the garage while he was gone.” About “twenty-five or thirty minutes” after Larkins saw Fritsche leave, he heard an accident had occurred.
 

 A waitress at the restaurant testified she saw Fritsche there about “fifteen of twelve”; that she sold him “two frankfurters and a pack of cigarettes”; and that he stayed there “about ten minutes,” talking to her and at the same time standing at the door and looking over at the garage through the glass windows of the restaurant. She stated she saw him leave, going across to the east side of Stenton Avenue and then south toward the garage and about five minutes later, at “just twelve o’clock, some one came in and said Arthur was killed.”
 

 We think the compensation authorities were justified in drawing the above quoted inferences from the testimony to which we have referred.
 

 Taking that testimony as a whole, it is a reasonable inference therefrom that Fritsche was struck by the automobile just as he turned away from the mail box after dropping a letter into it in the furtherance of the business and affairs of his employer. Whether he took the letter with him when he went to the restaurant, as
 
 *159
 
 indicated in the fifth finding of the referee, or returned to the garage to get it, as suggested by the testimony of the waitress and Palladiani, is immaterial. The fact that decedent, when injured, was not absent from the garage premises
 
 solely
 
 for the purpose of getting lunch distinguishes this case from
 
 Boal v. State Workmen’s Ins. Fund et al.,
 
 127 Pa. Superior Ct. 237, 193 A. 341. There, the employee had been away from the premises of the employer for several hours for no reason other than obtaining refreshment for himself and was injured while returning to the building in which he was employed.
 

 We think the ultimate conclusion of the board upon this phase of the case — that decedent’s accidental injuries were sustained in the course of his employment— is supported by sufficient competent evidence.
 

 2. The second branch of this case relates to the marital status of the claimant at the date of the employee’s accidental death. Upon this question the testimony is voluminous but for present purposes need not be discussed in detail. It is not disputed that claimant, a native of Prague and now about sixty years of age, entered into a ceremonial marriage with the decedent at Baltimore, Md., on February 2,1905; lived with him continuously as his wife up to the time of his death; has borne him two daughters, one of whom is married and has a child; and was dependent upon him. She and Fritsche knew each other in Prague, came to America upon the same boat, and were married the day after their arrival at Baltimore.
 

 It is equally true that claimant had previously been married to one Johann Deutsch in her native land in 1901. With relation to this marriage, claimant testified Deutsch had been “a sickly man,” had lived “a very wild life,” and was “very brutal” to her; that she lived with him in Prague for several years and then obtained what she understood and believed to be a decree of ab
 
 *160
 
 solute divoree from him; that she last saw him at the time of her divorce;, and that, while living at Carlsbad for a few. months before coming to America, she had received a letter from a Mrs. Hoffman informing her of the death of Deutsch.
 

 Under all the evidence, the decree upon which she relied as establishing her legal right to remarry was not one of absolute divorce but a decree of separation from “table and bed,” comparable to our decrees of “divorce from bed and board.”
 

 It was contended by appellants that as the evidence failed to show claimant had obtained an absolute divorce from Deutsch, or that he had died, prior to February 2, 1905, claimant’s relationship with Fritsche, beginning on that date, was meretricious in its inception and remained so until his death.
 

 The finding of the board upon this branch of the case was set out in its first conclusion of law reading:
 

 “First: Although the claimant was previously married to Johann Deutsch, from whom she secured a divorce ‘from table and bed’ October 27, 1903, her marriage to the decedent February 2, 1905 and her continued cohabitation with him throughout his life, bearing children to him, raised a presumption of the validity of the marriage of February 2, 1905, which has not been rebutted by any competent evidence of record.”
 

 The question of law now involved upon this part of the case is whether the established principles of law have been properly applied to the evidence upon the record. Here, as in
 
 Breiden v. Paff,
 
 12 S.
 
 &
 
 R. 430, there is no proof establishing the fact either of the existence or of the death of claimant’s former husband at the time of her marriage to Fritsche.
 

 The argument in behalf of appellants’ contention overlooks the principle announced in the above case that where it is unavoidably necessary to decide on the existence of facts, without a particle of evidence on either
 
 *161
 
 side, and a “decision in a particular way would implicate a party to the transaction in the commission of a crime, or any offense against good morals, it ought to be avoided, for the law will not gratuitously impute crime to any one, the presumption being in favor of innocence, till guilt appear.” In that case it was also stated by Gibson, J., that “in an old transaction,” such as is also here present, “the fact of a second marriage is of itself some evidence of the death of the former husband.” See also
 
 Senser et al. v. Bower et ux.,
 
 1 P. & W. 450.
 

 The clear, comprehensive and convincing opinion by Finletter, P. J., of the court below, contains a review of all the pertinent authorities upon the question now under consideration. We adopt the following excerpts from that opinion:
 

 “The second question is the marital status of the claimant. The pertinent facts are that she was married to the decedent February 2, 1905, by a ceremonial marriage conducted by a priest, and authorized by license. They lived together as husband and wife for thirty-three years, having two children, daughters, now adults aged thirty and thirty-one years. There is also a grandchild. From these facts there is a strong presumption of the validity of this marriage. It appears however that claimant had been married previously to one John Deutsch, and had been divorced while both were resident in Austria by one of the courts of that empire. It is contended by defendants that this divorce was only from bed and board. We are of opinion that defendants’ interpretation of the decree is correct and that if Deutsch were alive on February 2, 1905, the marriage to Fritsche was invalid. It appears in the proofs that Deutsch was alive in 1903, and the presumption would arise that he was still in existence on February 2, 1905. There is no proof on the subject to confirm such presumption.
 

 
 *162
 
 “The situation thus presented is a conflict of presumptions, the one of the validity of the ceremonial marriage, supported by the mode of life of the claimant and decedent, and the other, the presumption of the continued existence undivorced of the first husband. Where such a situation arises the courts will permit that presumption to prevail which negatives criminality and the bastardizing of issue.
 

 “There is also to be considered the burden of proof. This in our opinion rests upon the defendants. The claimant’s proofs establish the validity of the ceremonial marriage. It is for the defendants to show the illegality of this marriage. This they can do by showing, first, the partial character of the divorce, and second, that the first husband was alive undivorced at the time of the second marriage. They show this only by reference to the presumption of life. As we have said, the only proof of Deutsch’s continued existence is that presumption.
 

 “There is no comparison between the consequences of adopting the presumption of legal marriage and those of adopting the presumption of life. If the presumption of legal marriage prevails the effect is to legalize a lifetime of domestic happiness, firmly established by the uncontradicted testimony. If the presumption of life controls, the married life of this couple commenced with bigamy, continued in adultery, and the two innocent daughters must be held to be bastards. This is not the way the courts have treated such situations.......
 

 “It was said in Freedman on Marriage and Divorce in Section 83, page 203: Where a person contracts two separate marriages, the difficult question arises, in the absence of specific evidence, whether the first should be deemed lawfully to continue or the second marriage will be presumed to have been validly entered into, even at the price of presuming the dissolution of the prior marriage. The first marriage is supported by the presump
 
 *163
 
 tion of the continuance of a relation once shown to have been in existence, but this presumption may be neutralized by the presumption of innocence of the party who remarries and of the legitimacy of the children of the relationship. The presumption of innocence may, under the circumstances, be of sufficient strength to outweigh the presumption of the continuance of the first marriage, and if necessary, dissolution of the first marriage by death of the spouse, or by divorce,, may be presumed.
 

 “ ‘The general rule, therefore, is that a second marriage ordinarily will be presumed valid, notwithstanding evidence that one of the parties to it had previously contracted a marriage with another or had lived with another under circumstances showing cohabitation and reputation ordinarily sufficient to raise a presumption of marriage.’
 

 •»****#
 

 “In the note to 34 A. L. B. 487, it is said ‘ — where the presumption of innocence and of the validity of the marriage conflict with the presumption of life, and neither is aided by proof of facts or circumstances cooperating with it, the presumption of the validity of the marriage has generally beén held to be the stronger, and
 
 to
 
 prevail over the presumption of the continuance of the particular life; and this although the time elapsing between the last knowledge of the former spouse and the second marriage is much less than seven years.’ ” See also the opinion of Bicb, P. J., in
 
 Wile’s Estate, Rump’s Appeal,
 
 6 Pa. Superior Ct. 435.
 

 The case of
 
 Wilbert v. Com. Sec. Reserve Acc. et al.,
 
 143 Pa. Superior Ct. 37, 17 A. 2d 732, cited by appellants as controlling the one now at bar, is readily distinguishable. There, the woman claiming as the widow of the deceased employee, Wilbert, gave detailed testimony as to their common law marriage in 1923. When it appeared by her admissions on cross-examination that she
 
 *164
 
 had an undivorced husband (Kearney) by a former marriage in 1900, whose death did not occur until 1929, she attempted, without any adequate explanation, to contradict her former statement as to the date of the inception of her common law marriage with Wilbert, so as to fix it after her first husband’s death. It was held that her altered and contradictory statements did not constitute the substantial evidence required by the statute, but compelled the conclusion stated at page 46 that “claimant
 
 Jcnew
 
 when she entered into the alleged common law marriage with Wilbert that her husband, Kearney, was living and not divorced.” (Italics supplied.) It followed that her “relationship with Wilbert was meretricious, and remained so in the absence of a change of status.” Here, not only was there no proof of knowledge by claimant that Deutsch was still alive in 1905, but even positive testimony by her, admitted without objection, that she had been informed of his death.
 

 The case of
 
 Sharpe v. Federal Window and Office Cleaning Co. et al.,
 
 144 Pa. Superior Ct. 231, 19 A. 2d 509, also relied upon by appellants, is clearly distinguishable. There, a period merely of months intervened between the time the deceased employee separated from his first wife, and, according to claimant’s testimony, entered into a common law marriage with her. There was no proof, nor even suggestion, of a divorce or the death of the first wife. Neither the proofs nor the presumptions were equal, nor was the legitimacy of a child involved. The presumption that the beginning of the relationship between the claimant and the deceased employee was meretricious was too strong to be overcome by the presumption of innocence.
 

 A regular ceremonial marriage of the claimant to the deceased employee having been shown, the burden of proving that she did not have legal capacity to enter into, that marriage rested, under all the authorities,
 
 *165
 
 upon the present appellants. We are convinced they failed to sustain that burden.
 

 Being satisfied that the findings of the board upon each branch of this case are supported by sufficient competent evidence and that the law has been properly applied thereto, none of the assignments can be sustained.
 

 Judgment affirmed.