## Watt Estate.

46

Argued October 1, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, O'BRIEN and KEIM, JJ.

*Robert Levin,* with him *William M. Acker,* and
*Levin, Levin and Levin,* for appellant.

*Lee C. McCandless,* with him *Richard L. McCand-
less,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, No-
vember 13, 1962:

On this appeal from a decree of the Orphans' Court
of Butler County two questions are presented: (1) at
the time of the death of George R. Watt (decedent) on
July 27, 1957, who was his lawful wife?; (2) if it was
Veronica Watt, had she, by desertion or estoppel, for-
feited her right to any claim against decedent's estate?

Decedent entered into *four* ceremonial marriages:
(a) with Bessie Lewis from whom, at her suit, he was
divorced on December 18, 1928; (b) with Veronica
Fisher to whom he was married on June 25, 1929 and
from whom he was divorced *fraudulently* on December
17, 1945; (c) with Ida Bowman to whom he was mar-

ried on January 26, 1946, a marriage dissolved by her death on July 4, 1949; (d) with Ruth Thompson to whom he was married on July 31, 1950 and with whom he lived up until his death in 1957. No children were born of any of the marriages.

Between the time of his marriage to Veronica Fisher and his marriage to Ida Bowman, the decedent—on September 26, 1945—instituted a divorce action against Veronica F. Watt in Court of Common Pleas No. 2 of Philadelphia County, an action which culminated in the grant of a divorce on December 17, 1945. Veronica Watt did not learn of this divorce until after decedent's death and, thereupon, she petitioned Court of Common Pleas No. 2 of Philadelphia County to vacate the divorce on the ground of extrinsic fraud.[1] It appears that in this divorce proceeding Ida Bowman, with whom decedent had been living in Allegheny County since 1943, masqueraded and posed as Veronica Watt, that the address given as that of Veronica Watt was in fact that of a property purchased by decedent and Ida Bowman in 1943 *as tenants by the entireties* wherein decedent and Ida Bowman lived, that Ida Bowman, posing as Veronica Watt, employed counsel in Philadelphia to represent her and that, although decedent well knew the address of Veronica Watt, he concealed such fact from the court and Veronica Watt was never notified or served in this proceeding. Notice of the

---

[1] This should have been a petition to *open* the decree. ". . . a divorce decree can be vacated or stricken off only for a defect apparent on the face of the record. Where new evidence . . . must be introduced in order to sustain the attack, the decree should not be vacated or set aside, but should be opened. [citing cases] :" *McLaughlin v. McLaughlin*, 199 Pa. Superior Ct. 53, 56, A. 2d . We will consider the petition filed as a petition to open, not to strike or vacate, the decree. Furthermore, inasmuch as the petition alleged extrinsic fraud in falsifying Veronica Watt's residence and in having Ida Watts impersonate her, the petition could be filed *after* the term in which the decree was entered.

petition to vacate the divorce was given to all parties in interest, including Ruth Watt and decedent's two surviving sisters. The divorce was set aside on March 7, 1958 and from the order setting aside this divorce no appeal was taken.[2]

Decedent died, intestate, on July 27, 1957 survived by two sisters and two persons each claiming to be his lawful wife, Veronica Watt and Ruth Watt. Letters of administration in his estate—valued at approximately $16,000—were granted by the Register of Wills of Butler County to Ruth Watt. At the instance of Veronica Watt, Ruth Watt was required to file a first and partial account to which Veronica Watt filed exceptions.[3] Later Veronica Watt, claiming the surviving spouse's allowance and one-half of decedent's estate, petitioned the Orphans' Court of Butler County setting forth that, as decedent's surviving widow, she requested that certain realty be set aside as her allowance and asked the appointment of appraisers of such realty. Appraisers appointed by the court valued the realty at $7500 and their report was confirmed nisi by the court. To this order of confirmation Ruth Watt excepted, alleging that the appraisal was inadequate, that Veronica Watt was not decedent's lawful widow and that, even if she were, she had forfeited her rights by a wilful and malicious desertion of decedent. The Orphans' Court of Butler County referred all these matters to Dale Painter, Esq., as auditor and said auditor, after hearing, concluded that Ruth Watt was decedent's lawful

---

[2] The circumstances under which this divorce was secured clearly portray a deliberate fraud perpetrated by decedent and Ida Bowman upon both the court and Veronica Watt so that decedent and Ida Bowman might marry which they did less than six weeks later.

[3] On the ground that Ruth Watt was not decedent's lawfully wedded wife, Veronica Watt excepted to her claim for a widow's exemption and to her administratrix' fee because she had no right to administer and such fee was excessive.

widow, that Veronica Watt was not the lawful widow, dismissed Veronica Watt's exceptions to the account and sustained Ruth Watt's exceptions to the confirmation of the appraisers' report. Exceptions to the findings and conclusions of the auditor were argued before Judge FRANK GRAFF, specially presiding, and Judge GRAFF overruled these exceptions. From that order this appeal was taken. It is to be noted that Judge GRAFF, unlike the auditor, did not determine whether Veronica Watt was decedent's lawful wife at the time of his death but considered such determination unnecessary for the reason that Veronica Watt had forfeited any rights she might have because she had maliciously and wilfully deserted the decedent in May, 1950 and her conduct established that she had participated in a fraud on Ruth Watt and she was, by such conduct, estopped from claiming any part of the estate.

At the outset it must be noted that findings of fact of an auditor, confirmed or approved by the court below, will not be disturbed on appeal except for clear error or unless unsupported by the evidence: *Stauffer Estate*, 372 Pa. 537, 94 A. 2d 726;[4] *Sadtler v. Home Pattern Co.*, 302 Pa. 527, 153 A. 769. However, this rule has no application where the findings are only inferences or deductions from other facts or conclusions from reasoning: *Gongaware's Estate*, 265 Pa. 512, 514, 109 A. 276.

It is established that on June 25, 1929 decedent and Veronica Fisher entered into a valid marriage which was performed, under the authority of a valid marriage license, in a religious ceremony. From this established fact two well established principles of law become rele-

---

[4] In *Worrall's Appeal*, 110 Pa. 349, 362, 1 A. 380, we said: "When the appellate court is satisfied that facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake." See also: *Miller's Estate*, 279 Pa. 30, 36, 37, 123 A. 646.

vant. In the first place, decedent could not marry another person unless this valid prior marriage had been dissolved either by Veronica Watt's death or by the grant of a divorce either to decedent or to Veronica Watt and any such attempted marriage would be absolutely void:[5] *Heffner v. Heffner,* 23 Pa. 104, 106; *Gise v. Commonwealth,* 81 Pa. 428; *Heslop v. Heslop,* 82 Pa. 537; *Thomas v. Thomas,* 124 Pa. 646, 655, 17 A. 182; *Wayne Township v. Porter Township,* 138 Pa. 181, 182, 183, 20 A. 939; *Clark's Estate,* 173 Pa. 451, 34 A. 68; *Cline's Estate,* 128 Pa. Superior Ct. 309, 311, 312, 194 A. 222. In the second place, upon proof of a valid marriage, the law presumes that such marriage *continues* until the death of one of the parties (actual or presumptive after seven years) or a divorce is proven: *Schaefer v. Schafer,* 189 Pa. Superior Ct. 120, 124, 149 A. 2d 578; *Madison v. Lewis,* 151 Pa. Superior Ct. 138, 145, 30 A. 2d 357; *Divvers's Estate,* 22 Pa. Superior Ct. 436; *Wile's Estate,* 6 Pa. Superior Ct. 435, 440. Therefore, as a result of decedent's lawful marriage to Veronica Watt, decedent could not lawfully have married Ruth Watt unless and until he was lawfully divorced from Veronica Watt (she being alive at the time of the marriage to Ruth Watt) and the law presumes the continuance of that marriage. There can be no doubt that decedent, in entering upon his marriage with Ida Bowman and Ruth Watt, relied upon the decree of divorce, granted prior to both marriages, conferring upon him the capacity to remarry. Such reliance upon the divorce by decedent and Ida Bowman was without any justification because both were parties to the fraud which eventually vitiated this divorce. Assuming that Ruth Watt acted in the utmost of good faith and in reliance upon the decree of divorce, per se such good

---

[5] "A man having a wife in full life is utterly powerless to make a valid contract of marriage, and his attempt to do so is entirely nugatory": *Heffner v. Heffner,* supra, p. 106.

faith and reliance on her part would not breathe vitality into her marriage to decedent unless, *in fact,* decedent had the legal capacity to enter into such a marriage. The auditor correctly concluded that the setting aside of the divorce decree in 1958 rendered null and void the divorce granted in 1945 and that the setting aside of such divorce decree was binding upon the parties, the auditor and the court in this proceeding. The effect of the opening of the divorce decree was that, absent evidence or proof of any *other* divorce between Veronica Watt and decedent, decedent lacked the legal capacity to enter into either the marriage with Ida Watt or with Ruth Watt.

However, the law recognizes other strong presumptions which are presently pertinent, i.e., the presumption of innocence in contracting a second marriage as well as the presumption of the validity of a second marriage, the former furnishing the rationale for the latter.[6] Underlying both presumptions is the theory that parties to the second marriage did so innocently and without criminal or wrongful purpose or intent and that the law will infer matrimony rather than concubinage. In the case at bar we have a second or later marriage and we are, therefore, confronted with these several presumptions, the one presuming the continuance of the valid prior marriage and the other presuming the validity of the second marriage. The problem arises as to the weight which is to be given to each.

On this subject the clearest and most logical expression is that approved by the late President Judge KELLER, speaking for the Superior Court, in *Madison v. Lewis,* 151 Pa. Superior Ct. 138, 30 A. 2d 357, quoting from the opinion of the court below (pp. 145, 146) : "When a valid marriage is proven, the law presumes

---

[6] In many of the cases where children have been born of the second marriage the presumption of legitimacy considerably strengthens the presumption of the validity of the second marriage.

that it continues until the death of one of the parties (actual or presumptive after seven years), or a divorce is shown. Without either of these appearing if one of the parties marries again, while another presumption arises that it is innocent, that *alone* is not sufficient to overcome the previously existing presumption of the continued validity of the first marriage. *The second presumption does not of itself destroy the first but requires some proof of facts and circumstances to be given the effect of overcoming the first*; as for instance, the long lapse of time during which the other party may be presumed to have died, the question of legitimacy of a child of the second marriage, the fact that the other spouse had likewise remarried and proof that the decedent, whose heirs are attacking the second marriage, had himself recognized the validity of it."[7] (Emphasis supplied) To hold that the presumption of innocence and the presumption of the validity of a second marriage per se overcome the presumption that a valid marriage once established continues until the contrary is proven would result in a situation where the presumption of innocence and presumption of the validity of the second marriage "could be applied with equal effect to validate every case of meretricious relations, of which scores or more have been rejected as invalid in the Supreme Court and this court": *Sharpe v. Federal Cleaning Co.*, 144 Pa. Superior Ct. 231, 242, 19 A. 2d 509. In *Sharpe*, supra, the court approved the following language of the court below: " '. . . Something more than legal presumption was required to establish

---

[7] In the instant case, the "other party" is still alive, there is no question of the legitimacy of any child, Veronica Watt has not remarried and, except for the implication arising from a statement contained in a letter from Veronica Watt to decedent that she understood that decedent "had taken unto [himself] another" there is no evidence on this record that Veronica Watt *knew* of the marriage of decedent to Ruth Watt, let alone recognized it.

the fact that Claude E. Sharpe had been freed from his marital contract with Rachel Sharpe so that he could contract a new marriage with Amanda Sharpe. A man cannot at the same time legally have two wives; and one who has married once cannot lawfully marry again unless the first marriage has been dissolved by absolute divorce or by death. . . . The marriage of a man or woman, where one of them has by a prior marriage a husband or wife who is then living and undivorced, is not merely voidable, but void, whether it be meretricious or founded in mistake.' "

The real thrust of the several presumptions is to place the burden of proving the invalidity of the second marriage upon the person who claims such invalidity and to require proof of *some nature* that the first marriage was not dissolved by death or divorce at the time of the second marriage. From the presumption in favor of the validity of the second marriage and the presumption of innocence upon the part of the parties to that marriage there follows, as a corollary, another presumption, i.e., that either death or divorce had terminated the prior marriage, and he who claims the invalidity of the second marriage must overcome that presumption by proof of *some nature*: *Wile's Estate*, 6 Pa. Superior Ct. 435; *Holben's Estate*, 93 Pa. Superior Ct. 472; *Thewlis's Estate*, 217 Pa. 307. The presumption that a first marriage has been terminated by death or divorce is neither absolute nor inflexible and each case must be resolved on the basis of its own facts and circumstances and such inferences as fairly arise and can be reasonably drawn from them. The presumption of the dissolution of a prior marriage, by death or divorce, should be indulged in only with the greatest of caution, otherwise the status of marriage may be seriously jeopardized. Where there is a conflict between the various presumptions, that presumption should yield which from the evidence and inferences therefrom render it the least probable to sustain.

With these principles in mind we turn to the evidence and the inferences of record in the case at bar. The ultimate presumption upon which the auditor reached his conclusion was that the marriage between decedent and Veronica Watt had been dissolved by divorce. The basis for the auditor's conclusion was that, while the long lapse of time, the statements, declarations and actions of Veronica Watt, the innocence of Ruth Watt and "the other facts and circumstances here present" (which the auditor fails to specify) do not per se prove the dissolution by divorce of decedent's marriage to Veronica Watt, they do show a *"probability"* of such dissolution, considering that decedent had lived in Allegheny and Butler Counties as well as South America, in all of which jurisdictions he *could have* secured a divorce. Therefore, concluded the auditor, these factors plus the presumption of innocence "neutralized" the presumption of the continuance of the decedent-Veronica Watt marriage and left unproven by Veronica Watt the fact that the marriage had *not* been dissolved by divorce.

Presumptively, the second marriage of decedent to Ruth Watt is valid and, presumptively, the parties to the marriage between decedent and Veronica Watt had been divorced at the time the second marriage took place; therefore, it became incumbent upon Veronica Watt to overcome these presumptions by showing, by evidence or inferences reasonably drawn from such evidence, the improbability that either party to the decedent-Veronica Watt marriage had secured a valid divorce prior to the marriage of decedent to Ruth Watt in 1950. We must examine this record to ascertain whether there is any evidence or inferences therefrom proving the improbability that either party secured a valid divorce.

It can hardly be disputed that the parties had not been divorced up until 1945 at the time decedent insti-

tuted his divorce action in Philadelphia. The fact that decedent instituted this action renders clearly unlikely and highly improbable that up until that time he had secured a divorce; we cannot attribute to the decedent a vain and useless act. The manner in which that divorce was obtained is highly significant insofar as it throws light on whether up until that time a divorce had been obtained by Veronica Watt. Through the machinations of decedent, every effort was made to conceal from Veronica Watt any knowledge of the divorce proceedings, even to the extent of having Ida Watt masquerade as Veronica Watt, and such concealment clearly raises the inference that Veronica Watt would have opposed the divorce and, by the same token, the inference that she up until that time had not obtained a divorce. Furthermore, it was only *after,* and shortly thereafter, the grant of this divorce in Philadelphia that decedent married the woman with whom he had been living meretriciously for some time, a clear indication that decedent considered that the grant of this divorce removed the *only* impediment to a marriage with Ida Watt, negativing the existence of any other prior divorce. It was decedent's reliance on this divorce decree which led to his marriage with Ida Watt and later with Ruth Watt and it is clear that his reliance on the vitality of this divorce decree relieved him of any motivation thereafter to secure a divorce from Veronica Watt.

The conduct of the parties from 1930 to 1950, particularly after 1945, is also significant. The decedent, in manifest duplicity, and Veronica Watt, presumptively with innocence in the absence of any evidence to the contrary, continued to recognize their marriage and, although they did not reside under the same roof, they met at frequent intervals, had sexual relations, spent many week-ends together and, as late as 1949 and the early part of 1950, were planning on the establishment

of a matrimonial domicile. Just as we extend to the parties to a second marriage the presumption of innocence, by the same token, in the absence of evidence to the contrary, we must extend to Veronica Watt the presumption that she believed that the conduct between the parties arose from the marital state rather than a meretricious relationship and from such conduct infer that, so far as Veronica Watt knew, the marriage between the parties had not been dissolved, certainly by any action on her part. Moreover, until Veronica Watt learned of the meretricious relationship between decedent and Ida Watt, she had, so far as the record reveals, no grounds for divorce.

Moreover in this record is correspondence consisting of six letters, one written by decedent to Attorney Walter Criste of Cresson, Pa. and the other five written by that attorney to his client, Veronica Watt. Such correspondence covered a period from April 23 to May 29, 1957, a period slightly more than two months prior to decedent's death. From this correspondence certain facts are established: (a) Attorney Criste, prior to April 23, 1957, had informed decedent of an action of divorce then contemplated by Veronica Watt and requested that decedent pay counsel fees and costs in connection with such action; (b) decedent then inquired upon what grounds Veronica Watt would seek a divorce; (c) decedent actually paid $375 toward counsel fees and costs; (d) Attorney Criste concluded that, since Veronica Watt's residence was in Maryland, she could not institute a divorce action in Pennsylvania; (e) the money advanced by decedent was returned to him. Such correspondence clearly reveals that, up until several months prior to decedent's death and seven years after his marriage to Ruth Watt, Veronica Watt not only was unaware of the divorce granted in Philadelphia but that she was unaware that *any* divorce had been granted at the suit either of de-

cedent or herself. To view this evidence in any light is to attribute to Veronica Watt in contemplating a divorce in 1957 a vain and useless act. From her conduct in 1957 the *only* inference which can possibly be drawn is that she had not had the marriage dissolved by divorce. Likewise, decedent's apparent willingness to have a divorce at this time may be attributed to a desire to have the marriage dissolved by a divorce untainted by fraud.

On the state of the instant record Veronica Watt has, by the production of evidence and by the inferences arising from such evidence, effectively rebutted the presumption that her marriage to the decedent had been dissolved by divorce and has shown that the presumption of the validity of the second marriage cannot apply under the instant factual situation. The evidence and inferences arising therefrom do not at all support the auditor's conclusions that the presumption that the first marriage had been dissolved by divorce should prevail; on the contrary, the conclusion is clear and inescapable that this first marriage has not been dissolved by divorce. The presumption that the marriage between decedent and Veronica Watt continued until decedent's death must prevail and Veronica Watt must be considered as the lawful widow of decedent.

The auditor next concluded that Veronica Watt, in May, 1950, wilfully and maliciously deserted decedent and thus forfeited any right to claim a share in decedent's estate. Under the Intestate Act of 1947 (Act of April 24, P. L. 80, §6, 20 P.S. §1.6) it is provided: "A wife who, for one year or upwards previous to the death of her husband, shall have wilfully and maliciously deserted him, shall have no title or interest under this act in his real or personal estate." In *Fellabaum v. Alvarez*, 165 Pa. Superior Ct. 173, 177, 67 A. 2d 788, it was said: "The mere fact that the parties lived apart is not controlling and would not bar . . . dower rights

unless there had been a desertion under the Act. Desertion differs from separation. Desertion is an actual abandonment of matrimonial cohabitation with intent to desert, without cause or consent of the other party. [citing cases] It is presumed to be wilful and malicious where one spouse withdraws from the common home without legal reasonable cause . . . ." See also: *Lodge's Estate,* 287 Pa. 184, 134 A. 472. With the exception of the statutorily prescribed period of one year, the "desertion" contemplated under the Intestate Act, supra, consists of the same type of conduct considered as "desertion" under the divorce statute: Act of May 2, 1929, P. L. 1237, §10; Act of March 19, 1943, P. L. 21, §1, 23 P.S. §10.

The auditor found: "The undisputed evidence before the Auditor establishes that the parties lived separate and apart from 1930 to sometime in July, 1949; that on the latter date, the parties had resumed marital relations and had sexual intercourse as man and wife and agreed to resume living together and thereafter did actually agree upon a marital domicile, to-wit, the husband's farm home on Wolf Creek in Slippery Rock Township, Butler County, Pennsylvania and that the parties did actually reside there together at least for a short time on one or more occasions; it is not alleged by Veronica Fisher Watt that she returned to the marital domicile at Wolf Creek after May, 1950 or that they had sexual relations thereafter or that the marital relationship continued thereafter or that she and [decedent] at any time thereafter resided together as man and wife . . . . Here the *consensual separation* of 20 years was broken and ceased when the parties . . . in July, 1949 agreed to resume the marital relationship and to live together in a marital domicile belonging to the husband at Wolf Creek. The desertion here involved commenced sometime between July, 1949 and April, 1950, when [decedent] requested [Veronica

Watt] to resume marital relations with him and provided a marital domicile which she agreed to be suitable". (Emphasis supplied) The auditor then concluded that Veronica Watt never intended to accept the offer to resume living with decedent, that her consent was a "reserved consent" and the desertion commenced when she refused decedent's offer or at most would have commenced when she left decedent's home in May, 1950. The auditor's finding and conclusion of wilful and malicious desertion is not supported by the evidence of record.

It was the burden of Ruth Watt to prove that a desertion had occurred which would bring Veronica Watt within the forfeiture provisions of the statute and our inquiry is to decide whether she has sustained this burden. The auditor found that, for almost twenty years during which the parties lived apart, such separation was consensual and the record fully supports such finding. The record reveals that during a considerable portion of that time—*not only from July 1949*—the parties spent considerable time together, had sexual relations and stayed at various places in various localities and there can be no doubt that, while the parties did not live under the same roof, such separate living was consented to by the decedent. Under such circumstances, consensual separation could be transformed into a desertion *only* after a request made *in good faith* for the resumption of married life is ignored. In *Klaus v. Klaus,* 147 Pa. Superior Ct. 189, 24 A. 2d 33, the Court said (p. 192) : "Where the separation is with the consent of the husband, only a bona fide request to return ignored by the wife will change the character of the separation into that of a malicious desertion within the meaning of our divorce laws. . . .; the attempt to effect a reconciliation and a resumption of the family relationship must be made in good faith."

Does this record reveal an offer made *in good faith* by decedent to resume married life and a rejection of such offer by Veronica Watt? Throughout this record there is evidence of references by decedent to some unspecified and strange troubles or difficulties which had to be straightened out by him before the parties could resume married life, the only specification of any such trouble taking place when decedent and Ida Watt were living together, either before or after their marriage, at which time decedent expressed a fear of "that woman". It is significant of decedent's state of mind that in February 1950, at a time when he was unemployed, he wrote to Veronica Watt: "I realize you would like to get to know for sure, what and where we go, from here. But so would I. And I will have to see where I am going from here on out. It would be nothing for me to be on the down and out side, but with you in that kind of a deal, no". The last meeting between the parties took place in May, 1950 at the farm in Slippery Rock and at that time decedent was asked by Veronica Watt: "Do you want me to come down next weekend?" and decedent replied: "Why so soon?" In saying goodbye to Veronica Watt, decedent said: "You'll get a letter on Wednesday" but no letter ever came. Veronica Watt testified that she had written to her husband, told him that until she knew definitely what his plans were, she could not resign her teaching job and notified him that she did not intend living with him as in the past, i.e., clandestinely. To this no satisfactory reply was ever received. Within two months of the last meeting between the parties, decedent married Ruth Watt and effectively precluded any resumption of married life with Veronica Watt. Under all these circumstances, particularly since decedent knew what Veronica did not know, i.e., that he had secured a divorce, it is crystal clear that decedent did not *in good faith* desire to effect a reconciliation and a resumption of mar-

ried life and that there was no rejection by Veronica Watt of an offer to resume married life. In finding that Veronica Watt maliciously and wilfully deserted decedent both the auditor and the court fell into error because the record clearly does not support such finding.

The court, unlike the auditor, reached the conclusion that Veronica Watt by her conduct was estopped as a claimant in this estate. The court stated: "If [decedent] was legally married to Veronica upon July 31, 1950, when he married Ruth, a great and grievous fraud was perpetrated upon Ruth. The question which now arises is whether Veronica, by her conduct, contributed to this fraud. We are of the opinion that she did." The bases upon which the court reaches this conclusion are: (a) Veronica for twenty-seven years in three different places taught school under her maiden name;[8] (b) never demanded support of her husband;[8] (c) was content to live as a single woman having clandestine meetings;[8] (d) that, even though she knew of decedent's marriage to Ida Watt, she made no objection thereto;[9] (e) that she knew of the marriage when the estate of Ida Watt was being settled;[10] (f) that in 1949 and 1950 decedent and Veronica Watt stayed at the home of decedent's parents to deceive the parents;[11] (g) that she knew Ida Watt was known in Slippery Rock as dece-

---

[8] There is absolutely no evidence that Ruth Watt *knew* any of these facts.

[9] There is no evidence whatsoever that Veronica Watt *knew* of any marriage between Ida Watt and decedent. There is evidence that, through decedent, she learned that he was living with Ida Watt and that she did nothing about it. It is also upon this record that for some of this period she was meeting with decedent and having relations with him.

[10] The record does not so reflect.

[11] We fail to find the basis for this inference.

dent's wife, never made known to anyone that she claimed to be decedent's lawful wife and, had she done so, such knowledge would have come to Ruth Watt prior to her marriage in July, 1950;[12] (h) that when Veronica learned of the decedent-Ruth Watt marriage she should have notified her that the marriage, in her eyes, was bigamous and, knowing that a fraud had been perpetrated upon Ruth Watt, she made no effort to rectify the situation.[13] From this the court concluded that it "was the plain duty of Veronica to speak out when she learned of this marriage. The failure to do so, secrecy and deceit in her own conduct, gives rise to an estoppel".

The court in reaching this conclusion relied on *Romanski Estate,* 354 Pa. 261, 47 A. 2d 233, *Richardson's Estate,* 132 Pa. 292, 19 A. 82, and *U. S. National Bank in Johnstown v. Drabish,* 187 Pa. Superior Ct. 169, 144 A. 2d 640. In *Romanski,* supra, this Court held that,

---

[12] The auditor found as a fact that Veronica Watt sometime in 1944 secured employment to teach and taught near Wilmington, Delaware, until 1947, taught from September 1, 1947 until June, 1948 in Wilmington, Delaware, and, thereafter, was employed up until the date of hearing in the public schools of Baltimore, Maryland. Her place of employment was far removed from Slippery Rock Township where Ida Watt was living with decedent. Furthermore, there is no evidence at all that Ida Watt's position *as decedent's wife* was known to Veronica Watt or whether she did or did not make known to anyone that she, Veronica Watt, claimed to be the lawful wife. The record further shows that Ruth Watt did not know either decedent or Ida Watt prior to the latter's death nor is there any basis, except pure speculation, for the statement that had Veronica Watt made known to people in Slippery Rock that she was the lawful wedded wife that such knowledge would have come to the attention of Ruth Watt prior to her marriage.

[13] There is no evidence that Veronica *knew* of the marriage to Ruth Watt until after decedent's death. From the statement in a letter to decedent that she had heard he had taken to himself another woman it could well be implied that it was a repetition of the Ida Watt-decedent relationship rather than a marriage situation.

in litigation relating solely to marital property rights as contrasted with matrimonial actions wherein the State is an interested party, a claimant, as widow, is barred from attacking the validity of a foreign divorce which she herself procured from the decedent; *Romanski* would be presently applicable only if Veronica Watt was attacking the validity of a divorce which she obtained but that obviously, is not the present situation. In *Richardson,* supra, the facts were as follows: In 1849, Richardson married one Matilda Little and had two children by her; in 1857 the parties separated and Richardson, a Pennsylvania resident, instituted a divorce action in Pennsylvania which was refused in 1859; upon the same grounds Richardson, then residing in Indiana, obtained a divorce in that state; in 1861 Richardson married one Sarah Walter by whom he had three children before her death in 1880; in 1881 he married one Louisa S. with whom he lived until his death. In the meantime, Matilda Richardson had remarried and later separated. Upon Richardson's death, Matilda Richardson made claim of his estate as his lawful wife. The court pointed out that after 1860, although in need, she never made any demand upon her husband for support and that with *full knowledge* she acquiesced in the marriage of Sarah Walter and raised no question of the invalidity of that marriage for the twenty years during which that marriage continued and that such facts gave rise to a strong presumption that her own marriage to Richardson had either been annulled or that it had been discovered never to have had a legal existence. Furthermore, Matilda Richardson acquiesced in the marriage of Richardson to Louisa, a fact which adds strength to the presumption. The court then added: "If this were all, it would not be easy to conceive of a case to which the doctrine of estoppel could be applied with greater justice; but there is much more" (p. 293). The court then pointed out

that Matilda had remarried and, that, in order to sustain her claim against the estate, she had to prove illegal her second marriage and show that she had committed bigamy. Under such circumstances the court properly held that Matilda was "estopped from alleging the continuance of the former coverture, where the effect is to invalidate the later one" (p. 294). *Richardson* does not control the instant situation for the facts are vastly different; in *Richardson* there was actual knowledge of both later marriages by the claimant as well as a remarriage by the claimant herself neither of which are present in the factual situation in the case at bar. The decisional point of *Richardson* is that, under the evidence, a strong presumption arose that Matilda Richardson's marriage to Richardson had either been dissolved or never had a legal existence and that Matilda Richardson was by her own conduct *in remarrying* estopped from raising the question. In *U. S. National Bank in Johnstown,* supra, the defendants having certified to a bank from which credit was obtained that certain work had been satisfactorily completed, were held estopped as against the bank to defend on the ground that the work was not satisfactorily completed. It is evident that this decision is presently inapposite.

"The essential elements of an equitable estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in ques-

tion; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially": 19 Am. Jur., Estoppel, §42, pp. 642, 643.

It would seem in the case at bar that, if there was a concealment of facts, it was that, so far as Veronica Watt knew, her marriage to decedent had never been dissolved and that she claimed that she was his lawful wife. Insofar as the elements, supra, are applicable to her, there is no recorded evidence, or inferences therefrom, that Ruth Watt *knew* Veronica Watt or her manner of living, assuming, arguendo, that her manner of living was more consistent with a single rather than a married status, therefore, how could the *conduct* of Veronica Watt have conveyed to Ruth Watt any impression whatsoever? While Veronica Watt knew of no divorce action which would have dissolved the marriage and while she was of the impression that her marriage was still in effect and, to that extent, *had knowledge of the facts,* yet there is not a scintilla of evidence from which it could be inferred that she had the *intention* by her conduct to have Ruth Watt rely upon such conduct and believe that decedent so far as Veronica Watt was concerned was under no legal incapacity to marry. Insofar as the elements, supra, are applicable to Ruth Watt, there can be no doubt that she lacked *knowledge,* and perhaps the *means of knowledge,* as to the non-dissolution of the marriage, but there is absolutely no evidence or inferences therefrom which indicate that she *relied* on the conduct of Veronica Watt and, in reliance thereon, acted prejudicially to her own interests. The act which prejudiced Ruth Watt was her marriage to decedent; such act was brought about not by reliance upon any conduct of Veronica Watt, a woman she did not know, but by the fraudulent divorce decree and the fraud and deception practiced upon her by the decedent. The sins of the decedent should not

be visited upon Veronica Watt. The record contains no evidence from which it can be inferred that, prior to her marriage, Ruth Watt *knew* that Veronica Watt lived alone and taught under her maiden name, that she never demanded support from decedent, that decedent and Veronica Watt, on visits to his parents' home, occupied separate rooms or that, during the period of the decedent-Ida Watt marriage, Veronica Watt had made no claim to be decedent's lawful wife. Absent such knowledge, how could Veronica Watt's conduct have misled Ruth Watt? The doctrine of equitable estoppel has no application under the instant facts.

In our view of the evidence and inferences therefrom herein presented, the marriage of decedent and Veronica Watt was never terminated by divorce and, at the time of decedent's death, she was his lawful wife; the finding that, for one year prior to the decedent's death, Veronica Watt had wilfully and maliciously deserted decedent is without evidential support; the finding and conclusion that Veronica Watt, by her acts and conduct, is estopped from attacking the validity of the marriage between Ruth Watt and decedent is without basis in fact.

We have noted that in the auditor's report a question was raised as to the propriety of the procedure adopted by Veronica Watt in seeking the surviving spouse's allowance. That question not having been raised on this appeal does not demand our consideration.

Decree reversed and the record remanded to the court below for proceedings in conformity with the views expressed in this opinion. Each party to pay own costs.