**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Randy REESE, Appellant.**

Superior Court of Pennsylvania.

Argued March 11, 2010.
Filed Nov. 4, 2011.

Noah M. Geary, Washington, for appellant.

Michael J. Lucas, Assistant District Attorney, Charleroi, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, GANTMAN, PANELLA, DONOHUE, SHOGAN, ALLEN, LAZARUS, and MUNDY, JJ.

OPINION BY GANTMAN, J.:

Appellant, Randy Reese, appeals from the judgment of sentence entered in the Washington County Court of Common Pleas, following his conviction for first degree murder. In pursuit of a new trial, Appellant challenges four of the trial court's evidentiary rulings. We hold that Appellant's claims do not merit the new trial he requests. Accordingly, we affirm.

This case involves the following relevant facts and procedural history. On Sunday, February 20, 2005, around 3:45 P.M., Martha Medili reported to police that she had discovered John Lewis dead in his apartment bedroom. Investigation revealed Mr. Lewis had sustained blunt force trauma to his head as well as several stab wounds to his chest and a large slice wound to his neck. The immediate crime scene was very bloody but showed little signs of a struggle. Mr. Lewis was found completely naked except for his shoes and socks. There were no signs of forced entry. There were, however, signs of an attempted cleanup that, in addition to Mr. Lewis' extensive blood loss, the heat, and the moisture in the apartment, severely compromised the collection of solid fingerprints or DNA evidence. The apartment building where Mr. Lewis lived and was found had surveillance cameras, which recorded the entry and exit of the residents and visitors. The authorities obtained the actual surveillance tapes and observed Appellant several times on the surveillance tape recordings for Saturday, February 19, 2005, and very early Sunday morning, February 20, 2005. Appellant was wearing a distinctive baseball cap and an identifiable sweatshirt. Further investigation led the police to arrest Appellant on Thursday, February 24, 2005, for the murder of Mr. Lewis.

Appellant was arraigned and charged with criminal homicide. Following several delays, on October 24, 2005, the court appointed current counsel to represent Appellant. On February 17, 2006, counsel moved for additional time to prepare a defense. The court granted the motion and continued the case until April 17, 2006. Meanwhile, Appellant filed an omnibus pretrial motion to suppress the baseball cap, any and all statements of Appellant made on February 24, 2005, subsequent to his arrest, all photographs depicting cuts on Appellant's hands and head, and testimony about the cuts. Appellant also challenged the lawfulness of his arrest and moved to quash the criminal information. The court held the suppression hearing on May 20, 2006, after which the court asked the parties to brief the issues. By opinion and order entered October 23, 2006, the court denied Appellant's motion to suppress evidence, to declare the arrest un-

lawful, and to quash the criminal information. On December 28, 2006, the court granted a joint request for a continuance and scheduled trial for April 23, 2007.

On April 4, 2007, Appellant filed notice of an alibi defense. The Commonwealth filed a motion *in limine* on April 16, 2007, to admit, *inter alia*, the testimony at trial of Janise Kohn, Appellant's putative wife, regarding certain statements Appellant had made in a telephone call to her on Sunday evening, February 20, 2005, as well as in two other telephone calls he made to her on the ensuing days. On April 18, 2007, Appellant filed his own motion *in limine* to preclude, *inter alia*, Janise Kohn's testimony, claiming the content of the telephone conversations at issue constituted confidential communications made during their marriage.

On Monday, April 23, 2007, the court held a hearing on the warring motions *in limine*. With respect to Appellant's invocation of the spousal privilege, Janise Kohn testified regarding her relationship with Appellant. She stated she had known Appellant for about five years and married him in a ceremony on July 18, 2002. She filed for a divorce in 2006. Appellant signed an affidavit of consent for the divorce in September 2006. Between July 2002 and the divorce in 2006, Ms. Kohn said she and Appellant actually lived together for about only three to six months, but not continuously; two months was the longest they had ever spent together at any one time. Ms. Kohn kept her own name, rented her own apartment, and Appellant would stay with her from time to time; but he was not on her lease. Over the years she knew Appellant, Ms. Kohn had obtained at least two protection from abuse ("PFA") orders against him for personal injury and property damage. She said she did not file for a divorce sooner because she was afraid of Appellant and

what he might do, given his continued threats of harm to her and to himself. Ms. Kohn told the court that Appellant stayed with her for one week in December 2004, when he was released from jail, until he was banned from her apartment complex for causing a disturbance. After Appellant left, he called Ms. Kohn from time to time just to check in with her. She described their relationship as "broken."

Sometime in January 2005, Appellant told Ms. Kohn he was staying with another woman, Linda Cape, and intended to sleep with her. Ms. Kohn also saw Appellant in January 2005, when she gave him a ride in her car. In the car she asked for a divorce, and Appellant threatened a murder/suicide scenario. The threat stopped her from seeking a divorce at that time. Another incident occurred on January 13, 2005, when Appellant surprised Ms. Kohn at her workplace and asked her for another ride. When she declined, he showed her a knife. Ms. Kohn reported the incident to her manager, who called the police. Ms. Kohn filed a police report. After that, Ms. Kohn saw Appellant once more, when he arrived at her apartment uninvited, late in the middle of the night, and refused to leave until early the next day. They did not engage in sexual relations.

The next time Ms. Kohn heard from Appellant was on the evening of Sunday, February 20, 2005, when he called to tell her that Mr. Lewis was dead, and not from natural causes. During that call, Appellant suggested he would be brought in for questioning because he was on the surveillance tapes at Mr. Lewis' apartment house. Ms. Kohn asked Appellant if he "did it"; Appellant answered "of course, no." Appellant's counsel focused initially on the telephone calls but also asked Ms. Kohn if she had told Appellant at any time since 2004 that she wanted to patch things up with him. Ms. Kohn insisted to the contrary

that she had asked Appellant repeatedly over the years for a divorce. Ms. Kohn also confirmed Appellant's first telephone call to her on the weekend of the murder was in the evening of Sunday, February 20, 2005. On re-direct examination, Ms. Kohn told the court Appellant had hocked his wedding band and ripped up their "marriage license" within a week of the July 18, 2002 ceremony. (*See* N.T., 4/23/07, at 4–34.)

Appellant testified. He asserted Ms. Kohn was his wife in February 2005, when he made the telephone calls at issue; and he expected the content of the calls to be confidential. Appellant said Ms. Kohn married him in 2002, filed a PFA against him in 2003, and took him into her home in 2004, when he was released from jail and had no place to go. Appellant conceded that when he made the telephone calls to Ms. Kohn in February 2005, he was seeing another woman. Still, he claimed he expected the calls would be confidential. On cross-examination, Appellant disputed both the content and the timing of the telephone calls at issue. Appellant further claimed he had called Ms. Kohn two/three times every week, but he could not remember exactly when. The other woman Appellant was with in February 2005, was Linda Cape. In fact, at the time of the homicide Appellant was already living with her, first at 207 Main Street, then at 25 West Walnut Street. (*Id.* at 34–45). The Commonwealth asked Appellant about a woman named Crystal, and an unanticipated exchange occurred:

[Commonwealth]: Aside from Linda Cape, are there any other women that you had relationships with during this period of marriage with Janise Kohn?

[Appellant]: No.

[Commonwealth]: Was there a girl by the name of Crystal [Enos]?

[Appellant]: Yeah. That's my previous wife before Janise.

[Commonwealth]: When were you married to Crystal?

[Appellant]: I believe it was back in either '99 or 2000.

[Commonwealth]: Where were you married to her?

[Appellant]: Washington.

[Commonwealth]: Where is Crystal today?

[Appellant]: I believe that she's in Maryland.

[Commonwealth]: Did the two of you get a divorce here?

[Appellant]: No.

[Commonwealth]: Did you ever get a divorce?

[Appellant]: Yes, '03.

[Commonwealth]: Where?

[Appellant]: She filed for divorce, I believe it was Owings Mills, Maryland or something like that.

[Commonwealth]: I'm sorry, [Appellant]. Speak closer to the microphone.

[Appellant]: She filed for divorce in Maryland.

[Commonwealth]: Do you recall the year that she filed for divorce?

[Appellant]: No, I don't.

[Commonwealth]: Was it 2003?

[Appellant]: I can't recall.

[Commonwealth]: Could it have been later than 2003?

[Appellant]: I don't think so.

[Commonwealth]: Do you have any recollection if it was in 2002?

[Appellant]: I just don't remember.

[Commonwealth]: Did you separate from Crystal and then start seeing Janise Kohn?

[Appellant]: Yes.

[Commonwealth]: [Appellant], did you contest the divorce with Crystal?

[Appellant]: No, I didn't.

[Commonwealth]: Did you receive a decree?

[Appellant]: I didn't. I believe my father did.

[Commonwealth]: Your father did?

[Appellant]: Yes.

[Commonwealth]: Is that Mr. Melvin Reese?

[Appellant]: Yes, sir.

[Commonwealth]: And he lives off of Morganza Road?

[Appellant]: He did at the time.

[Commonwealth]: He doesn't live there anymore?

[Appellant]: No, sir.

[Commonwealth]: Are you able to obtain the decree from him?

[Appellant]: No.

[Commonwealth]: You think it was somewhere in Maryland that you were divorced?

[Appellant]: Correct.

[The Court]: You mentioned a name.

[Appellant]: She lived in Owings Mills, Maryland.

[Commonwealth]: Are you sure it was in Maryland that she obtained the divorce?

[Appellant]: I am quite sure.

[Commonwealth]: Did you have to go down for any type of proceedings?

[Appellant]: No.

[Commonwealth]: Did you have to sign any documents?

[Appellant]: I didn't sign nothing. I didn't contest.

[Commonwealth]: Do you have children together?

[Appellant]: No, sir.

(*Id.* at 45–47). Essentially, Appellant could not remember the date of the purported divorce from Crystal Enos, he signed no papers related to any divorce proceeding, he did not know where the divorce was granted, and he could not obtain or produce a copy of that divorce decree.

During final remarks to the court, the Commonwealth challenged any application of Section 5914, given both the nature of the communications and the lack of any reasonable expectation of their confidentiality. Appellant's counsel first conceded the real issue was the content of Appellant's telephone call to Janise Kohn on Sunday, February 20, 2005, and the two other calls made during the following week. Counsel adopted the hard line that the telephone calls were "confidential communications" made during the marital relationship, protected under Section 5914, and privileged. The court deferred its ruling on the privilege issue until trial was underway; the court cautioned both sides not to mention the calls in opening statements. (*Id.* at 57). Trial began with opening statements and the Commonwealth's case in chief.

On the next day of trial, the court initially heard from counsel in chambers. The Commonwealth said its independent research could not confirm Appellant's alleged divorce from Crystal Enos. The Commonwealth argued Appellant presented no credible evidence of a divorce from Crystal Enos. Given no lawful marriage between Appellant and Janise Kohn, the content of Appellant's calls to Ms. Kohn was admissible at trial.

Appellant's counsel asked for some time to review the Commonwealth's position and discuss it with his client. Later that day, defense counsel simply objected to the Commonwealth's argument on the grounds of hearsay and authenticity; the defense produced no competent evidence to sup-

port Appellant's claim of a divorce from Ms. Enos or a lawful marriage to Ms. Kohn. Based on the testimony of record, the court determined Appellant had the duty to show a valid marriage to Janise Kohn, which he failed to do. Accordingly, the court ruled Appellant could not assert the spousal privilege under Section 5914 to bar Ms. Kohn's testimony. (*See* N.T., 4/25/07, at 313.)

During the trial, the Commonwealth produced significant other evidence tying Appellant to the crime including, but not limited to, the unnatural death of Mr. Lewis, a homicide caused by sharp and blunt force trauma; surveillance videotapes capturing Mr. Lewis allowing a man, wearing a hooded "AERO" sweatshirt and baseball cap with circular emblem, to enter the building on Saturday night at about 11:06 P.M.; surveillance videotapes showing a man leaving the building forty-five minutes later, wearing Mr. Lewis' winter coat and carrying a plastic bag; surveillance videotapes showing Appellant, wearing an AERO sweatshirt and baseball cap with circular emblem, trying to gain entry to the building at about 1:06 A.M.; testimony from Detective Stanek that, based on this video footage, Appellant was the last person seen with Mr. Lewis before his death; testimony of two other persons (Appellant's Adult Probation Officer, Randy Butka, and Janise Kohn) identifying the man on the surveillance videotapes as Appellant; testimony from another resident who confirmed Appellant's presence in the building late at night on February 19th and early in the morning on February 20th; clear, color surveillance videotape from February 18th, taken at the courthouse, showing Appellant wearing an identical AERO sweatshirt and baseball cap; a baseball cap recovered from Appellant's residence, containing Mr. Lewis' DNA in miniscule blood splatter; Appellant's knowledge of the crime as conveyed to others, including a statement to a housemate, Cathy Hetrick, and three later telephone calls to Janise Kohn; Appellant's efforts to elude police when they came to arrest him; evidence that Appellant possessed a knife; and testimony from another inmate, who said Appellant had threatened him, over a commissary debt, with color photos from the Lewis homicide together with boastful intimidations.

Importantly, with respect to Appellant's knowledge of the crime before Mr. Lewis' body was even discovered, the Commonwealth produced the testimony of Cathy Hetrick, who lived at 25 West Walnut Street with Appellant, Linda Cape, and others. Ms. Hetrick revealed Appellant was at her house around 10:30–11:00 A.M. on Sunday morning, February 20, 2005. Appellant told Ms. Hetrick he had received a cell phone call "that some guy got killed up there [at John Lewis' apartment house]." (*See id.* at 408–11.) Mr. Lewis' body was not discovered until after 3:00 P.M. on February 20th.

A jury convicted Appellant of first degree murder on April 30, 2007. The court sentenced Appellant to life imprisonment on June 20, 2007. Appellant filed a timely notice of appeal on July 6, 2007. The court ordered Appellant to file a concise statement of errors complained of on appeal, which Appellant timely filed. On April 21, 2009, a panel of this Court reversed and remanded for a new trial, with one judge concurring and dissenting. The Commonwealth filed an application on May 4, 2009, for *en banc* reargument, which this Court granted on June 26, 2009.

For purposes of reargument Appellant raised four issues for our review:

[WHETHER APPELLANT IS ENTITLED TO A NEW TRIAL] IN LIGHT OF THE FACT THAT THE [TRIAL] COURT VIOLATED, IN AN EGRE-

GIOUS MANNER, APPELLANT'S SPOUSAL PRIVILEGE, WHICH WAS PROPERLY INVOKED BY APPELLANT AND SUPPORTED BY EVIDENCE?

[DID THE TRIAL COURT ERR] FOR ADMITTING INTO EVIDENCE A BASEBALL CAP SEIZED IN APPELLANT'S RESIDENCE WHEN ENTRY INTO THE RESIDENCE WAS ACQUIRED VIA THE PURPORTED "CONSENT" OF A DEAF AND MENTALLY RETARDED HOUSEMATE ..., WHO SPECIFICALLY TESTIFIED THAT SHE COULD NOT EVEN HEAR WHAT THE OFFICERS WERE SAYING TO HER WHEN THEY ASKED HER IF THEY COULD ENTER AND THAT THE SOLE REASON SHE LET THE POLICE ENTER THE RESIDENCE WAS BECAUSE SHE WAS AFRAID? FURTHER, DID THE [TRIAL COURT] OVERLOOK THE TESTIMONY OF GOVERNMENT WITNESS AND HOUSEMATE WHO TESTIFIED THAT [THE CONSENTING HOUSEMATE] WAS (i) HYSTERICAL, (ii) OUT OF CONTROL, (iii) CRYING, AND (iv) "BESERKED" SIMULTANEOUSLY WITH LETTING THE OFFICERS ENTER THE RESIDENCE?

DID [THE TRIAL COURT ERR IN] ADMITTING INTO EVIDENCE A THREAT BY APPELLANT TO ANOTHER INMATE MADE TWO YEARS AFTER THE NIGHT IN QUESTION? THE [TRIAL] COURT RULED THAT THE THREAT WAS ADMISSIBLE BECAUSE SOMEHOW IT SHOWED APPELLANT'S "STATE OF MIND" TWO YEARS PRIOR–ON THE NIGHT IN QUESTION. BECAUSE IT IN NO WAY DEMONSTRATED APPELLANT'S STATE OF MIND TWO YEARS PRIOR, SHOULD THE STATEMENT/THREAT BE PRECLUDED AT RE–TRIAL?

DID [THE TRIAL COURT ERR IN] ADMITTING A PURPORTED PRIOR BAD ACT INVOLVING A KNIFE ON THE PURPORTED BASIS THAT IT CONSTITUTED ADMISSIBLE EVIDENCE UNDER P.R.E. 404(b), SPECIFICALLY OF "OPPORTUNITY," WHEN THE EVIDENCE MERELY DEMONSTRATED MEANS TO COMMIT THE CRIME IN QUESTION, NOT OPPORTUNITY, AND MEANS IS NOT A DELINEATED EXCEPTION UNDER [RULE] 404(b)?

(Appellant's Substituted Brief for Reargument at 6–7).

■ Appellate review regarding decisions on motions *in limine* implicates the following principles:

> A motion *in limine* is used before trial to obtain a ruling on the admissibility of evidence. It gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury. A motion *in limine* differs from a suppression motion in that a suppression motion is designed to preclude evidence that was obtained in violation of a defendant's constitutional rights, while a motion *in limine* precludes evidence that was constitutionally obtained but which is prejudicial to the moving party.

*Commonwealth v. King*, 456 Pa.Super. 72, 689 A.2d 918, 921 (1997) (internal citations and quotation marks omitted). Generally, a trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review. *Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa.Super.2010). *See also Commonwealth v. Bobin*, 916 A.2d 1164 (Pa.Super.2007); *Commonwealth v. Maloney*, 876

A.2d 1002, 1006 (Pa.Super.2005). In this context,

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Widmer,* 560 Pa. 308, 322, 744 A.2d 745, 753 (2000) (internal citation omitted). *See also Commonwealth v. Hyland,* 875 A.2d 1175, 1186 (Pa.Super.2005), *appeal denied,* 586 Pa. 723, 890 A.2d 1057 (2005).

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller,* 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting *Commonwealth v. Stallworth,* 566 Pa. 349, 363, 781 A.2d 110, 117 (2001)). "Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Drumheller, supra* (quoting *Stallworth, supra* at 363, 781 A.2d at 117–18).

On appeal, Appellant initially concedes that the record is 100% accurate. (*See* Appellant's Substituted Brief for Reargument at 22.) Regarding his issue of spousal privilege *via* application of Section 5914, Appellant claims the Commonwealth is trying to make new law by arguing the "failing" nature of his purported marriage to Janise Kohn to do an end-run around the Section 5914 spousal privilege. Appellant avers the conversations at issue, which he had with Janise Kohn, had nothing to do with their relationship, *i.e.,* Ms. Kohn was not the victim in this case. Essentially, Appellant quickly constructs and then rejects any proposition that a "failing" marriage somehow rebuts the presumption of privileged spousal communications. Appellant follows that argument with a very general tribute to the "sacred nature" of the spousal privilege and insists the trial court violated his privilege on the basis of incompetent, unauthenticated, hearsay information that was inadmissible. Appellant concludes he is entitled to a new trial because the court allowed Ms. Kohn to testify in abrogation of Section 5914. For the following reasons, we disagree.

■ The Pennsylvania Rules of Evidence do not modify existing law regarding testimonial privileges. *See* Pa.R.E. 501 (stating: "Privileges as they now exist or may be modified by law shall be unaffected by the adoption of these rules"). In analyzing the application of a testimonial privilege, we first observe:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence. As such, they must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.

*Commonwealth v. Spetzer,* 572 Pa. 17, 34, 813 A.2d 707, 717 (2002) (quoting *Trammel*

*v. United States,* 445 U.S. 40, 50–51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, —— (1980)) (internal citations and quotation marks omitted). Testimonial privileges are exceptions to the rule of relevance and in derogation of the search for truth; therefore, these privileges are not lightly created or expansively interpreted. *Commonwealth v. Stewart,* 547 Pa. 277, 282, 690 A.2d 195, 197 (1997). Pennsylvania law generally imposes the burden of proof on the party challenging the privilege. *Commonwealth v. Maguigan,* 511 Pa. 112, 125, 511 A.2d 1327, 1334 (1986). Nevertheless, the party claiming a privilege cannot rest on a mere assertion of the privilege because a simple assertion of the privilege would then automatically establish its validity, which is in violation of the well-recognized rule in this jurisdiction that no claimant of a testimonial privilege can be the final arbiter of his own claim. *See Commonwealth v. Hess,* 270 Pa.Super. 501, 411 A.2d 830, 833 (1979), *appeal dismissed as improvidently granted,* 499 Pa. 206, 452 A.2d 1011 (1982). The final decision on the application of a privilege is an evidentiary ruling that rests within the court's discretion. *See generally Commonwealth v. May,* 540 Pa. 237, 656 A.2d 1335 (1995).

Section 5914 of the Judicial Code, commonly called the "confidential communications privilege,"[1] states as follows:

### § 5914. Confidential communications between spouses

Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial.

42 Pa.C.S.A. § 5914. Only the defendant spouse asserting the Section 5914 privilege can waive it. *May, supra.* Section 5914 precludes a witness spouse from testifying against a defendant spouse "as to any communications which were confidential when made **and** which were made during the marital relationship." *May, supra* at 249, 656 A.2d 1335, 1341–42 (1995) (emphasis added). Thus, Section 5914 has at least two prerequisites which must be satisfied to trigger its protection: (1) a confidential communication that was made during (2) a lawful marriage. 42 Pa.C.S.A. § 5914. *See generally Commonwealth v. Small,* 602 Pa. 425, 980 A.2d 549 (2009). *See also Commonwealth v. Dubin,* 399 Pa.Super. 100, 581 A.2d 944, 946 (1990), *appeal denied,* 527 Pa. 592, 588 A.2d 912 (1991) (reiterating that, for protection of communication as confidential, "knowledge must be gained through the marital relationship **and** in the confidence which that relationship inspires").

If there is evidence of a first marriage, the law will presume that marriage continues until the death of one spouse (actual or presumptive after seven years) or a divorce. *In re Watt's Estate,* 409 Pa. 44, 52–53, 185 A.2d 781, 785–86 (1962). Absent the death of the one spouse or a divorce, "if one of the parties marries again, while another presumption arises that it is innocent, that alone is not sufficient to overcome the previously existing presumption of the continued validity of the first marriage. The second presumption does not of itself destroy the first but requires some proof of facts and circumstances to be given effect of overcoming the first [presumption]." *Id.* Thus, when the facts of a case involve two marriages and give rise to

---

1. *See Commonwealth v. Valle–Velez,* 995 A.2d 1264, 1267 (Pa.Super.2010) (addressing privilege not to testify against one's spouse under Section 5913, and distinguishing it from Section 5914 privilege, which is expressly limited to confidential communications and belongs solely to defendant spouse).

these conflicting presumptions, the **proponent of the second marriage must show something more than a legal presumption to establish the lawfulness of the second marriage.**[2] *Id.* (emphasis added). Even where the parties act in good faith and innocence, such good faith does not breathe vitality into the supposed second marriage. *Id.* Both parties must have the legal capacity to enter into the marriage; otherwise, any attempted second marriage is absolutely void. *Id.*

The very foundation for "invoking the marital privilege is the existence of a valid marriage." *Commonwealth v. Maxwell,* 505 Pa. 152, 165, 477 A.2d 1309, 1316 (1984), *cert. denied,* 510 U.S. 995, 114 S.Ct. 558, 126 L.Ed.2d 459 (1993) (discussing spousal privilege outlined in Section 5913). The test is **not** whether the parties believe they are married but whether they are married **under the law.** *Valle–Velez, supra* at 1268 (discussing privilege under Section 5913).[3]

2. We recognize *In re Watt's Estate* has yet to be used in a criminal context involving a defendant's claim of spousal privilege to bar testimony, perhaps because we are looking at this set of facts for the first time. Notably, in *Commonwealth v. Hancharik,* 534 Pa. 435, 633 A.2d 1074 (1993), our Supreme Court examined whether defendant's own communications to third parties defeated the presumption of the confidential nature of the same expressions he had made to his wife. The legal status of the relationship between the defendant and his wife **was not in dispute.** *Id.* Thus, the *Hancharik* Court had no reason to reference *In re Watt's Estate.* Likewise, in *Commonwealth v. McBurrows,* 779 A.2d 509 (Pa.Super.2001) (*en banc*), *appeal denied,* 572 Pa. 732, 815 A.2d 632 (2002), *cert. denied,* 540 U.S. 829, 124 S.Ct. 60, 157 L.Ed.2d 55 (2003), this Court was called upon to decide whether wife's observance of her husband's **act** of disposing of a murder weapon was a "confidential communication" for purposes of the spousal privilege. Again, the legal status of the relationship between the defendant and his wife was not in dispute. Hence, neither *Hancharik* or *McBurrows* had any reason to refer to *In re Watt's Estate.*

Further, we can identify instances in the criminal law context where the defendant has a preliminary "burden," such as, "a defendant moving to suppress evidence has the preliminary burden" to establish standing at the time of the search to challenge the evidence seized as well as a legitimate expectation of privacy in the area searched or thing seized. *See, e.g., Commonwealth v. Maldonado,* 14 A.3d 907, 910 (Pa.Super.2011). Similarly, we can all agree there are circumstances where we must borrow concepts from our civil law because there is a dearth of case law on the topic in the criminal context. *See,* e.g., *Commonwealth v. Lepre,* 18 A.3d 1225 (Pa.Super.2011) (relying on principles governing indigency in civil cases to review trial court's resolution of *in forma pauperis* application with respect to appeal in criminal case).

In the present case, the issue before this Court is the legal status of defendant and his purported second spouse. As *In re Watt's Estate* makes clear, the proponent of the second marriage must initially give some proof of facts and circumstances to give rise to the presumption of a valid second marriage and to overcome the presumption that his first marriage is still valid. Only after the proponent of the second marriage meets this obligation and succeeds in raising the presumption of the validity of the second marriage does the onus shift to the other side to disqualify the second marriage as invalid. *Id.* at 53–54, 185 A.2d at 786. A close reading of the *In re Watt's Estate* case illustrates these shifting duties and is consistent with established law on the relative burdens of production and persuasion in both criminal and civil law. Here, absent more, Appellant's mere assertion of a second marriage (notwithstanding any good faith belief) does not carry the presumption of its validity and shift the duty to the other side to show the second marriage is invalid, particularly where Appellant himself cast doubt on the basis for his declaration.

3. We realize that the Section 5913 privilege is "separate and distinct" from the Section 5914 privilege. *See McBurrows, supra; Valle–Velez, supra.* Nevertheless, the legality of the marital status of the parties is a factor under **both** statutes. *See* 42 Pa.C.S.A. §§ 5913, 5914.

With respect to the nature of the communication as "confidential," our Supreme Court has said: "For [Section] 5914 to apply, it is also 'essential ... the communication be made in confidence and with the intention that it not be divulged.' We look to whether the spouse making the statement had a **reasonable** expectation the communications would be held confidential." *Small, supra* at 446, 980 A.2d at 562 (internal citations and quotation marks omitted) (emphasis added). Under *Small,* the allegedly privileged communication is not considered "confidential" (made with the reasonable intent not to be divulged) for purposes of Section 5914, if the defendant has already personally disclosed the same or similar information to a third party. *Id.* Otherwise, "any remark made while two spouses were the only ones present" would be considered confidential, "thus eviscerating *May's* standard." *Id.* at 447, 980 A.2d at 562.

In *Hancharik, supra,* our Supreme Court examined whether certain testimony of the defendant's wife was subject to Section 5914 governing confidential communications between spouses and whether trial counsel had rendered ineffective assistance for failing to object to the testimony. *Id.* at 436, 633 A.2d at 1075. The Court decided the defendant's own communications to third parties defeated the presumption of the confidential nature of the same expressions he had made to his wife, such that she could testify about the other instances where her husband made identical remarks in a non-confidential setting. *Id.* Notably, the legal status of the relationship between the defendant and his wife **was not in dispute** in *Hancharik. Id.*

■ That said, "Not all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair

trial, not a perfect trial...." *Commonwealth v. West,* 834 A.2d 625, 634 (Pa.Super.2003), *appeal denied,* 586 Pa. 712, 889 A.2d 1216 (2005) (quoting *Commonwealth v. Drummond,* 775 A.2d 849, 853 (Pa.Super.2001), *appeal denied,* 567 Pa. 756, 790 A.2d 1013 (2001)). Harmless error exists when, *inter alia,* "the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence." *Commonwealth v. Watson,* 945 A.2d 174, 177 (Pa.Super.2008) (quoting *Commonwealth v. Passmore,* 857 A.2d 697, 711 (Pa.Super.2004), *appeal denied,* 582 Pa. 673, 868 A.2d 1199 (2005) (internal citation omitted) (emphasis added)). A violation of Section 5914 governing confidential communications between spouses does not constitute *per se* reversible error; admission of the testimony can be deemed harmless error, if the testimony is merely cumulative of other properly admitted evidence. *Small, supra* at 446, 980 A.2d at 562; *May, supra* at 252, 656 A.2d at 1343.

■ Instantly, both the Commonwealth and Appellant filed motions *in limine* concerning the proposed testimony at trial of Janise Kohn. At the hearing on the motions, Appellant admitted (1) he and Janise Kohn had "married" while he was still married to Crystal Enos; (2) he could not remember the date of his alleged divorce from Ms. Enos, (3) he signed no papers related to a divorce proceeding; (4) he did not know where the divorce was granted; and (5) he could not produce a copy of that divorce decree. Appellant's mere assertion of a marriage to Ms. Kohn was insufficient to establish its validity. *See Hess, supra* (stating simple assertion of testimonial privilege does not establish its legitimacy). By his own testimony, Appellant called into question the validity of his purported marriage to Ms. Kohn. By his own testimony, Appellant presented facts of

two marriages, which gave rise to conflicting presumptions. Absent more than Appellant's mere assertion of the second marriage, the presumption of the continued validity of his first marriage to Crystal Enos prevailed over the alleged validity of a second marriage to Ms. Kohn. *See In re Watt's Estate, supra.* Appellant bore the responsibility to produce confirmation of his divorce from Ms. Enos before he could enjoy the presumption of a valid second marriage to Ms. Kohn.[4] Because Appellant failed to show a lawful marriage to Ms. Kohn, the Commonwealth had nothing to disprove, and the court correctly decided Appellant could not invoke Section 5914 to bar Ms. Kohn's testimony at trial.[5]

■ To the extent the telephone call to Ms. Kohn on the evening of Sunday, February 20, 2005, disclosed Appellant's advanced knowledge of Mr. Lewis' death, the record makes clear Appellant had already told Cathy Hetrick about the homicide on the morning of that same day. Appellant's prior disclosure to Ms. Hetrick certainly calls into the question the **reasonableness** of Appellant's alleged expectation of confidentiality regarding his comments to Ms. Kohn. *See Small, supra.* Additionally, the properly admitted testimony of Ms. Hetrick regarding Appellant's disclosures to her of his advanced knowledge of the murder rendered Ms. Kohn's testimony cumulative on that particular point. *See Watson, supra.* Thus, any error possibly associated with the admission of Ms. Kohn's testimony about the content of the telephone calls was harmless. *See id.* In response to this issue, the trial court called this testimony "pivotal to the prosecution and damaging to the defense." (Trial Court Opinion, filed September 10, 2007, at 24). Notwithstanding the court's characterization, the record shows the Commonwealth had abundant other evidence linking Appellant to the crime charged. Therefore, we reject any suggestion that Appellant's conviction turned primarily on this limited portion of Ms. Kohn's testimony. As to the content of the other calls Appellant made to Ms. Kohn during the following week, in them Appellant disclosed details about the murder investigation which, by that time, were matters of common knowledge, observable by any interested person. Based upon the foregoing, Appellant's issue merits no relief.

In his following three issues combined, Appellant first challenges the court's decisions to admit the baseball cap seized in Appellant's residence because the consent

---

4. Appellant cannot rely on 23 Pa.C.S.A. § 1702(a) (allowing for reaffirmation of union after legal impediment is removed, provided certain requirements are met) to validate Appellant's alleged marriage to Ms. Kohn after 2003, because the record contains no evidence of Appellant's divorce from Ms. Enos, other than his self-serving testimony. Further, the testimony of Appellant and Ms. Kohn falls seriously short of any "good faith reaffirmation of commitment" to one another at any time. At the evidentiary hearing on this issue, Ms. Kohn testified she and Appellant lived together for only three to six months, and not continuously, between July 2002 and December 2004. The record specifies Appellant spent one week with Ms. Kohn in December 2004, which occurred immediately after his release from incarceration when he had nowhere else to go. The year before, Appellant was homeless, which was when Mr. Lewis befriended him and gave him a place to stay. In any event, without evidence of Appellant's divorce from Ms. Enos, there is no competent confirmation of continued cohabitation with Ms. Kohn in good faith. On this record, any consideration of a Section 1702 reaffirmation of union would be pure speculation.

5. Moreover, Appellant's argument on appeal regarding spousal privilege is so slim, conclusory, and unsupported that we could readily deem it waived.

to enter the home was flawed.[6] Specifically, Appellant contends the police obtained consent to enter the home from Linda Cape, a "deaf and mentally retarded" housemate, who could not hear or understand the request and who was completely intimidated by the police into acquiescing because she was afraid. In support of his contention, Appellant refers to the testimony of another housemate who described Ms. Cape as hysterical, out of control, crying, and "beserked" simultaneously with allowing the officers to enter the residence. Appellant asks us to revisit the validity of Ms. Cape's "consent."

Next, Appellant complains about the admission at trial of the testimony of inmate Robert Pataski, who stated Appellant had threatened him prior to trial with the graphic, color crime-scene photographs from the Lewis homicide. Appellant argues the testimony was irrelevant to show his present callousness or his "mental state" at the time of the homicide, where callousness is quintessential bad character evidence inadmissible at trial. Further, even if the testimony were relevant, then its prejudicial effect outweighed its probative value. Appellant insists the Pataski testimony must be excluded at his retrial.

Additionally, Appellant claims the testimony from Ms. Kohn regarding an incident that occurred at her place of employment should have been excluded at trial because it was inadmissible as bad character evidence under Pa.R.E. 404(a). Appellant avers his encounter with Ms. Kohn at Big Lots, where he flashed a knife at her, was irrelevant because the police recovered no murder weapon from the crime scene, and the victim sustained different types of blunt and sharp force trauma.

Appellant submits the court erred when it admitted the testimony that, five weeks before the crime, Appellant possessed a knife capable of causing the victim's injuries, because it fit no exception under Rule 404(b). Even if relevant, Appellant insists the prejudicial effect of this testimony outweighed its probative value. For these additional reasons, Appellant concludes he is entitled to a new trial where all of the evidence at issue is excluded. We cannot agree.

 At the outset we observe:

An appellate court's standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [Because] the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Muhammed,* 992 A.2d 897, 899–900 (Pa.Super.2010). The suppression court has sole authority to assess the credibility of the witnesses and is entitled to believe all, part or none of the evidence presented. *Commonwealth v. Shine,* 784 A.2d 167, 168 (Pa.Super.2001), *appeal denied,* 568 Pa. 682, 796 A.2d 316 (2002).

---

**6.** Appellant also anticipated the Commonwealth would argue in the alternative that the police had grounds to enter the premises because they had an arrest warrant for Appel- lant. The Commonwealth did not argue that point, so we give Appellant's preemptive response no further attention.

Warrantless searches and seizures are considered to be unreasonable and therefore, prohibited, except for a few established exceptions pursuant to both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Both the federal and Pennsylvania constitutions permit third party consent to a search. When police officers obtain the voluntary consent of a third party who has the authority to give consent, they are not required to obtain a search warrant based upon probable cause. [T]he Supreme Court explained that a third party possessing common authority over a premises can give valid consent to search against a non-consenting person who shares authority because it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Commonwealth v. Hughes*, 575 Pa. 447, 459, 836 A.2d 893, 900 (2003) (internal citations and quotation marks omitted). The third-party consent to search is an exception to the exclusionary rule. *Commonwealth v. Basking*, 970 A.2d 1181, 1194 (Pa.Super.2009), *appeal denied*, 604 Pa. 693, 986 A.2d 148 (2009). To evaluate the voluntariness of the consent to a warrantless search, the court must examine the totality of the circumstances. *Commonwealth v. Gillespie*, 573 Pa. 100, 106–107, 821 A.2d 1221, 1225 (2003). "Legitimate police activity can hardly be coercion." *Id.* at 107, 821 A.2d at 1226.

The overriding principle in determining if any evidence … should be admitted involves a weighing of the probative value versus prejudicial effect. We have held that the trial court must decide first if the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect. *Commonwealth v. Hawk*, 551 Pa. 71, 709 A.2d 373, 376 (1998). This Commonwealth defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Relevant evidence may nevertheless be excluded "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

*Commonwealth v. Serge*, 586 Pa. 671, 682–83, 896 A.2d 1170, 1177 (2006), *cert. denied*, 549 U.S. 920, 127 S.Ct. 275, 166 L.Ed.2d 211 (2006).

Pennsylvania Rule of Evidence 401 defines relevant evidence as follows:

### Rule 401. Definition of "relevant evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403. "Evidence will not be prohibited merely because it is harmful to the defendant." *Commonwealth v. Dillon*, 592 Pa. 351, 367, 925 A.2d 131, 141

(2007). Pennsylvania Rule of Evidence 404 provides:

> **Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes**
>
> **(a) Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> **(1) *Character of accused.*** In a criminal case, evidence of a pertinent trait of character of the accused is admissible when offered by the accused, or by the prosecution to rebut the same.
>
> * * *
>
> **(b) Other crimes, wrongs, or acts.**
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.
>
> * * *

Pa.R.E. 404(a)(1), (b)(1)-(3). "The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of the other-offense evidence—specifically, that jurors might convict a defendant because they perceive the defendant has a bad character or propensity to commit crimes." *Commonwealth v. Cascardo*, 981 A.2d 245, 251 (Pa.Super.2009), *appeal denied*, 608 Pa. 652, 12 A.3d 750 (2009). Evidence of other violent acts may be admissible "in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character." *Id.* at 250. "The list of 'special circumstances' is not exclusive and [our Supreme] Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury." *Id.* (citing *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985) (stating special circumstance exists to admit evidence of defendant's prior violent acts, where defendant made statement about prior acts to threaten and intimidate another, and force or threat of force is element of crime for which defendant is being prosecuted)). Likewise, a defendant's threat of another is a voluntary extrajudicial statement and can be used against the defendant at trial, even though the threat contains no clear admission of guilt on the offense prosecuted. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995); *Commonwealth v. Kitchen*, 730 A.2d 513 (Pa.Super.1999). Further, evidence that the defendant possessed a device or instrument that could have been the murder weapon is admissible. *See Commonwealth v. Miller*, 897 A.2d 1281 (Pa.Super.2006) (affirming admission of evidence that defendant was in possession of knife that could have been murder weapon); *Commonwealth v. Akers*, 392 Pa.Super. 170, 572 A.2d 746, 754–55 (1990) (reiterating testimony about defendant's possession of weapon that could have been used to commit crime is relevant; affirming admission of testimony from witness that five months before murder, defendant had shown witness gun similar to murder weapon).

■ In response to Appellant's "consent" claim, the trial court in relevant part stated:

In the instant case, Cathy Hetrick, Wayne Cunningham, Linda Cape, a woman named "Jessica" and [Appellant] all resided at 25 West Walnut Street as of February 24, 2005. [Appellant] rented an upstairs bedroom, which he shared with Linda Cape. All of the residents of 25 West Walnut had access to the common rooms on the first floor as well as the basement. Thus, Ms. Cape had joint access to and control of the same area of the house as [Appellant] and had the authority to consent to a search of the premises. Her third-party consent satisfied the requirement for the exception to a warrantless search.

It is clear that Ms. Cape had the authority to consent to the February 24, 2005 search of the shared residence, yet [Appellant] contended that her mental and physical disabilities prevented her from giving legal consent. During the hearing held on the Suppression Motion, Eleanor Judy O'Meara, Washington Communities Mental Health/Mental retardation Support Coordinator, testified as to Ms. Cape's mental abilities. As Ms. Cape's caseworker for over sixteen years, Ms. O'Meara explained that Ms. Cape was "borderline intellectual[ly] functioning" and was very adept at performing everyday tasks of living. Ms. Cape independently handles her finances, cooking, hygiene and household, and receives only minimal assistance from Washington Communities MH/MR. Additionally, [Appellant] claims that Ms. Cape was incapable of giving valid consent because she is deaf and was not wearing her hearing aids on the evening of the search. It has not been established that Ms. Cape is deaf, but it is known that Ms. Cape has hearing and speech impairments. Ms. O'Meara testified that Ms. Cape does have hearing aids, which assist her in hearing, but that she can still hear without the aids.

On May 3, 2006, Ms. Cape testified regarding the February 24, 2005 search of 25 West Walnut Street. From her demeanor and responses to questioning, this [c]ourt found she was capable of hearing and comprehending others. Ms. Cape demonstrated ample mental sophistication on the witness stand. Therefore, this [c]ourt determined that Ms. Cape was mentally and physically capable of giving legal consent to search.

[Appellant's] final argument regarding the validity of Ms. Cape's consent challenged the voluntariness of her consent. . . .

Upon arrival at 25 West Walnut Street, detective Stanek approached the door with detectives Luppino and Aielle behind him. Two other officers remained on the sidewalk in front of the residence. Detective Stanek knocked on the door, and Ms. Cape appeared at the front window. Detective Stanek asked Ms. Cape to come over to the door to speak with him. Once Ms. Cape opened the door, detective Stanek explained that they were looking for [Appellant]. Ms. Cape indicated that [Appellant] was not home, and detective Stanek asked if the police could come in and make certain he was not there. Ms. Cape replied, "Yes," and let the [detectives] into the residence.

Detective Stanek was the only [person] who spoke to Ms. Cape, and he did so calmly and respectfully. Detective Stanek testified that he knew Ms. Cape from prior contact with her, and thus he was familiar with her impairments and general demeanor. There was no attempt to enter the residence with force or aggressive tactics. That five [members of the police force] were present in Ms. Cape's view from the doorway does not amount to police excesses; [they] were prepared to arrest a suspect in a

violent murder case. Ms. Cape ... had the capacity to consent to a search, and did so. Considering the totality of the circumstances, from the testimony of both detective Stanek and Linda Cape, it is clear that the encounter between these two individuals was a peaceful one, and Ms. Cape's consent was not coerced. (Trial Court Opinion at 9–10) (internal citations omitted). The record supports the court's reasoning. The court was certainly free to assess the credibility of the witnesses and entitled to believe all, part or none of the evidence presented. *See Shine, supra.*

■ The court also addressed Appellant's argument against the admission of Robert Pataski's testimony regarding Appellant's threats as follows:

In support of [Appellant's] claim of error, [Appellant] argues the admission of this testimony was not relevant, and even if relevant, its prejudicial effect outweighed its probative value. The [c]ourt disagrees for [these] reasons.

On Friday, April 20, 2007, during argument on Pre–Trial Motions *in Limine,* [the Commonwealth] informed the [c]ourt that the District Attorney's Office had been contacted by the Washington County Correctional Facility in connection with an incident concerning [Appellant]. Apparently, the jail had received a report from an inmate who had been threatened by [Appellant] with 8″ × 10″ color crime scene photos from the Lewis homicide. Inmate Robert Pataski explained that there was an inmate in Four West who had threatened [Pataski] with photos depicting a nude elderly male with gray hair lying on a linoleum floor, covered with blood with a large wound in his neck. [Because] Pataski owed [Appellant] a commissary debt which he planned to discontinue paying, [Appellant] allegedly

threatened Pataski by saying something to the effect of, "Make the money right or this will be you," and "It took O.J. millions to get away with it, I'll get away with it for free," while showing the photos of the Lewis crime scene. At that point, Pataski entered the Special Housing Unit (SHU) and refused to leave, so as to avoid any further interaction with [Appellant].

The [c]ourt allowed the Commonwealth to present Pataski's testimony as to [Appellant's] threat, finding that [Appellant's] actions in showing the crime scene photos in a threatening manner was relevant to the case....

Here, the [c]ourt found that Inmate Pataski's testimony was relevant and that its probative value was not outweighed by the danger of unfair prejudice. Pataski's testimony that [Appellant], just days prior to his trial, used gruesome crime scene photos from the murder he was charged with committing to threaten Pataski tends to make the existence of certain facts of the case more probable than they would be without this testimony. For example, the defense took the position that [Appellant] did not commit this murder for the reason that [Appellant] and [Mr. Lewis] were friends who had known each other for a number of years. Through the testimony of Janise Kohn, the jury learned that Mr. Lewis even allowed [Appellant] to live with him over one winter when [Appellant] was homeless. Thus, the defense put forth the theory that it was highly unlikely that [Appellant] would kill one of his own friends. However, regardless of whether [Appellant] was actually the killer, the fact that [Appellant] could be so callous as to use horrific, blood-soaked crime scene photos depicting his purported "friend" nude with a slashed throat and eleven stab wounds

in a pool of his own blood, is very probative of [Appellant's] mental state.[7]

\* \* \*

For the reasons outlined above, the [c]ourt did not err in admitting the relevant testimony of Inmate Robert Pataski as to [Appellant's] use of crime scene photos to threaten him at the Washington County Correctional Facility. . . .

(*Id.* at 21–23) (internal citations omitted). We conclude the court's decision to admit evidence of Appellant's threat was proper. *See Simmons, supra; Claypool, supra; Kitchen, supra.*

■ Additionally, the court responded to Appellant's argument against the admission of testimony about an incident that occurred on January 13, 2005, at Big Lots:

[Appellant] next alleges that the [c]ourt erred in admitting the testimony of Janise Kohn as to a January 13, 2005 incident which occurred at her work site, Big Lots, wherein [Appellant] allegedly flashed a knife. . . . The [court admitted this testimony pursuant to Rule 404(b)(2), as proof that [Appellant] possessed a knife just five weeks prior to the murder of John Lewis and that this possession provided [Appellant] with the opportunity to commit the crime.

\* \* \*

At trial in this case, Ms. Kohn testified as to the January 13, 2005 incident at Big Lots as follows:

[The Commonwealth]: Ms. Kohn, did you see [Appellant] on January 13, 2005?

[Ms. Kohn]: Yes, I did.

[The Commonwealth]: Do you recall where you were you were when you saw him?

[Ms. Kohn]: I was at my job at Big Lots. I was working as a cashier.

[The Commonwealth]: Where did you see him that day, inside or outside?

[Ms. Kohn]: No. He came inside my store. He came over to where I was working as a cashier on my register and asked for a ride. He said that he had taken care of someone and wanted to take care of someone else and he flashed a knife.

Here, it is clear to the [c]ourt that [Appellant's] possession, and willing use of, a knife in a retail store in broad daylight made the Commonwealth's theory that [Appellant] killed Lewis more likely than it would have been without the introduction of this testimony. The key inferences from this testimony are the closeness in temporal proximity to the brutal Lewis murder, and [Appellant's] possession of a possible murder weapon of the same type used by the murderer. Under the exception contained in Rule of Evidence 404(b)(2), the [c]ourt found that the Big Lots incident qualified as a prior bad act which went to [Appellant's] possession of a knife and thus, his opportunity to commit the Lewis murder.

Prior to trial, the Commonwealth's proffer of Janise Kohn's testimony as to her recollection of the incident included her observation that [Appellant] was wearing the red Chevrolet baseball cap that day. Ms. Kohn had allegedly given the police a description of [Appellant] on the

---

**7.** Appellant clings to these words to argue his "state of mind" two years after the incident was not probative of his "mental state" on the day of the incident. We disagree with that interpretation of the court's message. Here the court allowed the evidence of the threat against Pataski to rebut the defense's position that Appellant could not have killed his "friend." Yet, Appellant used the macabre pictures of his "friend" in a cruel and gruesome way to threaten another person. The natural inference was: just imagine what Appellant could do to Pataski, if Appellant could do something like this to a "friend."

day of the Big Lots incident as wearing a red baseball cap, and Detective Sergeant Bruner of the South Strabane Police Department was to be called to testify to that fact. However, during the prosecution's examination of Ms. Kohn, [the prosecutor] barely touched upon the incident at Big Lots, and did not call Detective Bruner to the stand. Thus, Ms. Kohn's testimony in regard to the January 13, 2005 incident where [Appellant] flashed a knife was not emphasized beyond what was elicited above.

Even if the [c]ourt did err in admitting Ms. Kohn's testimony as to the Big Lots incident, it was not unduly prejudicial to [Appellant]. For these reasons, the ruling of this [c]ourt as to the admission of Ms. Kohn's testimony about the Big Lots incident should be affirmed.

(Trial Court Opinion at 18–21) (internal citations omitted). The court had sound legal authority to admit this evidence, and we see no reason to disturb the court's decision. *See Miller, supra; Akers, supra.*

Notwithstanding Appellant's contentions regarding the admissibility of the testimony about his telephone calls to Janise Kohn on February 20, 2006, and during the following week, the baseball cap, his threats to Inmate Robert Pataski, and the incident at Big Lots on January 13, 2006, we affirm the court's evidentiary rulings challenged on appeal, although at times we reach that conclusion on other grounds.

*See Commonwealth v. Beck,* 848 A.2d 987 (Pa.Super.2004) (stating appellate court may affirm order of trial court on any basis if decision is correct); *Commonwealth v. O'Brian,* 811 A.2d 1068 (Pa.Super.2002) (stating where trial court has reached correct result, its order will be affirmed if it can be sustained for any reason). The evidence of record supports the guilty verdict. Thus, Appellant's claims do not merit a new trial. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge DONOHUE Files a Concurring Opinion.

President Judge FORD ELLIOTT Concurs in the Result.

## CONCURRING OPINION BY DONOHUE, J.:

I concur in the result reached by the learned Majority affirming the trial court. I write separately to indicate that our Supreme Court has ruled on the issue of the burden of proof on spousal privilege in criminal cases on three prior occasions, each time concluding that the party asserting the privilege has the burden to establish a factual basis for the existence of the privilege.[1] *See, e.g., Commonwealth v. Wilson,* 543 Pa. 429, 445, 672 A.2d 293, 301 (1996); *Commonwealth v. Stots,* 436 Pa. 555, 558, 261 A.2d 577, 579 (1970); *Com-*

---

1. In reaching its decision to allow the testimony of Reese's purported second wife ("Kohn"), the trial court concluded that the Commonwealth established that Reese was not entitled to claim spousal privilege. In so ruling, the trial court relied on documents produced by the Commonwealth purporting to establish that Reese was not divorced from his first wife, thereby preventing a valid marriage to Kohn, whose testimony he was attempting to preclude. Trial Court Opinion, 9/10/07, at 24–26. I note parenthetically that the documents produced by the Common-

wealth and relied on by the trial court were never offered or admitted as evidence in the case and were thus not contained in the certified record on appeal. Consequently, although the basis of the trial court's ruling differs, this Court may affirm the trial court's decision on any basis, even one not argued by the prevailing party. *Commonwealth v. Allshouse,* 604 Pa. 61, 82, 985 A.2d 847, 859 (2009), *reversed on other grounds, Allshouse v. Pennsylvania,* —— U.S. ——, 131 S.Ct. 1597, 179 L.Ed.2d 495 (2011).

*monwealth v. Clanton*, 395 Pa. 521, 528, 151 A.2d 88, 92 (1959). As a result, in my view, today's decision should not be read to create new law in the area of spousal privilege in criminal cases.

I likewise write separately to respectfully express my disagreement with the Majority's application of the harmless error doctrine on the issue of spousal privilege. As this Court recently reaffirmed, the doctrine of harmless error is "a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt." *Commonwealth v. Koch*, —— A.3d ——, 2011 WL 4336634, at *8 (Pa.Super.2011). The harmless error doctrine may be employed only where the Commonwealth proves beyond a reasonable doubt that the trial court's error "could not have contributed to the verdict." *Id.* (citing *Commonwealth v. Moore*, 594 Pa. 619, 937 A.2d 1062 (2007)). Whenever there is a "reasonable possibility" that an error "could have contributed to the verdict," however, the error is not harmless. *Id.* (citing *Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa.Super.2004)).

On these standards, in my view, the harmless error doctrine cannot be applied here. In this case, the trial court, which observed both Kohn's testimony as well as the "abundant other evidence linking [Reese] to the crime charged" now relied upon by the Majority, expressly found that Kohn's testimony was *"pivotal to the prosecution and damaging to the defense."*

Trial Court Opinion, 9/10/07, at 24 (emphasis added). Although the Majority rejects the trial court's observation, in my view, the trial court's description of Kohn's testimony as "pivotal to the prosecution and damaging to the defense" makes it impossible for this Court to conclude that the decision to allow Kohn to testify, even if erroneous, "could not have contributed to the verdict." *Moore*, 594 Pa. at 638, 937 A.2d at 1073. Thus, relying on the trial court's first hand perspective of the importance and impact of Kohn's testimony, the harmless error doctrine cannot be applied in this case.

For similar reasons, I do not agree with the Majority's rationale that any error by the trial court on the spousal privilege issue was harmless because Kohn's testimony was cumulative of the testimony of witness Cathy Hetrick. To the contrary, the suggestion that the only importance of Kohn's testimony (like Hetrick's) was to show that Reese had advance knowledge of the Lewis murder (prior to its public disclosure by police), ignores the import of Kohn's testimony. The trial court found Kohn's testimony to be "pivotal to the prosecution and damaging to the defense" in substantial part because Reese's detailed knowledge of Lewis' murder and the police investigation (of him) in connection therewith, when combined with his severe depression and thoughts of suicide expressed during the calls,[2] amounted to a *de facto* **confession** by Reese of his guilt. Hetrick's limited testimony (namely, that Reese told her that "some guy got killed

---

**2.** Kohn testified that on Sunday evening, February 20, 2005, Reese called and told her that Lewis was dead, N.T., 4/25/07, at 369, and when Kohn asked if he had died from natural causes, Reese replied, "I wouldn't say all that." *Id.* at 369. Reese also divulged to her that he knew that the police would bring him

in for questioning because he was on the video coming into Bassettown Manor with Lewis on the night of the murder. *Id.* at 370. During this call, Kohn described Reese's tone as "very depressed. He said he had a bottle of pills. He was into suicide." *Id.* at 370.

up there") provided no such implied confession and therefore did not render Kohn's testimony merely cumulative.

However, because I agree with the Majority's conclusion that Reese failed to meet his burden of proof on his claim of spousal privilege, I concur in the result of affirmance.